O'BRIEN BROS., Inc., v. DIRECTOR GENERAL OF RAILROADS.

(District Court, S. D. New York. December 5, 1922.)

1. Shipping ⊷54—Handlers of chartered boats without motive power in New York Harbor charged with duty of knowing and acting on weather reports.

Persons largely engaged in handling boats without motive power in New York Harbor are charged with the duty of keeping themselves informed of expected changes in weather conditions ascertainable at the office of the Weather Bureau, and of instructing masters of their tugs accordingly, when dangerous storms or winds are predicted.

2. Shipping ⊷3½, New, vol. 8A Key-No. Series—Operator of harbor boats held liable for damage to scow in storm.

The Director General of Railroads, in charge of the operation of harbor boats in connection with a railroad, held liable for damages to a scow left in an exposed position, when, as disclosed by reports on file at the Weather Station, a dangerous storm was anticipated.

In Admiralty. Suit by O'Brien Bros., Inc., against the Director General of Railroads. Decree for libelant.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for libelant.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson, of New York City, of counsel), for respondent.

WARD, Circuit Judge. December 13, 1917, the scow Headlight, chartered by the libelant to the New York Central Railroad under the usual harbor charter of demise, was lying on the north side of Pier 2, Bush's Stores. In the early morning of the 14th the company's tug No. 10 was engaged in making up a tow at the end of Pier 2 for the West Shore Terminal at Weehawken. The tug took the lighter Adams from Fifty-First street, Brooklyn, and landed her at the end of the pier at 12:50 a. m. She then landed the scow Headlight outside of the Adams at 1:25 a. m. and then brought the barge Hoffmans from Erie Basin and made her fast outside the Headlight. While this was being done, the wind, which had been since 5 p. m. of the 13th blowing from the northeast, of no unusual force and in a direction not dangerous to the boats, suddenly shifted to northwest, blowing right on them with a force of 72 miles between 2:35 and 2:40 a. m., and 84 miles between 2:40 a. m. and 3:05 a. m., when it began to drop off again. The tug, not being able to shift the tow in such weather, took the master of the Headlight and his wife on board, and went for her own safety at 2:55 a. m. to Twenty-Ninth street, Brooklyn, where she arrived at 3:20 and lay storm-bound until 5:25 a. m. As soon as the captain reported the situation, tugs were sent to Bush's Piers.

⊷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The wind had been blowing since 4 p. m. from the east and since 8 p. m. from the northeast, which was an indication to watermen that it would back around by the north to northwest, and make Bush's Piers a dangerous berth for shipping. Mr. Scarr, in charge of the National Weather Bureau, testified that the barometer on the morning of the 13th was high, 30.37 inches; about 9 a. m. it began to fall very rapidly, and continued to fall at a pretty uniform and rapid rate until about 2:50 a. m. of the 14th, when it reached 29.10, a total fall of 1.27 inches. It snowed from 12:20 p. m. of the 13th to 3:40 a. m. of the 14th, when it turned to sleet; 6 inches fell up to midnight of the 13th. The storm was admittedly one of the worst on record, but Mr. Scarr said he expected a violent storm from the northwest, and that any one who understood the barometer would have known what was coming.

Bush's Piers are exposed directly to the full force of the wind from the northwest and are well known to be a dangerous berth in gales from that quarter. The master of the tug testified that he thought he saw a storm signal on the Whitehall Building about 9 p. m., but he did not know what the warning was; he had no barometer on board, and made no inquiries about the weather.

The warning displayed on the 13th at 8 p. m. was for a storm from the northeast, and the warning of a storm from the northwest was not displayed until 10:30 a. m. of the 14th, but the message received by the local office from Washington at 6 p. m. of the 13th stated that the wind would turn westerly in the early morning of the 14th.

[1] If the liability in this case depended solely on the conduct of the master of No. 10, I should have some hesitation in holding the Director General liable. But I think that, in case of persons who are largely interested in handling boats without motive power of their own in this harbor, the court should go back of the tug captains in the inquiry whether due care and skill and diligence have been exercised in the premises. The evidence is that the local Weather Bureau at New York knew, not only from the dispatch from Washington at 8 p. m. of the 13th, but from the steady backing of the wind from east to northeast, and from the rapid and uniform falling of the barometer, that a violent storm from the northwest was to be expected. The office is open day and night, and inquiries are constantly made of it by persons interested in harbor shipping. The captains of these harbor tugs are not left to act on their own responsibility, as the masters of ships at sea must be left. Their movements are regulated direct from the offices of their employers.

[2] When the government supplies to the public such a reliable source of information, I think persons who have the care of large numbers of helpless boats should apply to it for information and advice. There is no evidence whatever that the Director General did so. No such rule, as far as I am aware, has ever been laid down by judicial authority; but it seems to me that such a requirement will not only increase safety of life and property in the harbor, but will encourage the National Weather Bureau to progressive improvement and usefulness. Therefore I hold that the Director General was wanting in

due care and diligence in not applying to the local bureau, under the circumstances in this case, for a forecast of the weather. If he had done so seasonably, I am sure he would have been advised of the danger to the boats at Bush's Piers, and would have had plenty of time to remove them to a safe berth. See Nicholson v. Erie R. Co., 255 Fed. 54, 166 C. C. A. 382.

There may be the usual interlocutory decree in favor of the libelant.