## THE HEADLIGHT

### O'BRIEN BROS., Inc., v. DAVIS, Director General.

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

#### No. 331.

1. **Shipping ⬅54—In the absence of statute or usage requiring it, tug master not under duty to carry barometer.**

   In absence of statute or usage requiring master of harbor tug to carry a barometer, court cannot charge him with fault because of his failure to do so.

2. **Shipping ⬅54—Operator of harbor tugs under duty only to note publicly displayed signals of Weather Bureau.**

   It is the duty of the master of a harbor tug to note and give weight to the warnings of the Weather Bureau as publicly displayed; but he is under no duty, nor is the operator of a number of tugs, to apply to the bureau for private opinions or unpublished information about weather to come.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by O'Brien Bros., Inc., as owner of the scow Headlight, against James C. Davis, Director General of Railroads. Decree for libelant, and respondent appeals. Reversed and remanded, with directions.

For opinion below, see 287 Fed. 543.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge. We assume the facts as found by the court below in 287 Fed. 543.

In New York Harbor, at 8 p. m., on December 13, 1917, a northeast storm warning was displayed. Shortly after 2 a. m. of December 14th respondent's tug was engaged in shifting libelant's barge and other similar craft at Bush's Piers, Brooklyn—a place well known to be safe for such operations during even a gale from the northeast, but very dangerous in a northwesterly wind of any severity. While this shifting was going on the wind changed from a moderate easterly movement to

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

a storm of most unusual violence, blowing from the northwest, and this shift of wind was almost instantaneous.[1] In such weather the tug was obliged to leave the boats, including libelant's at Bush's Piers, and tied up herself. The barges were injured, and this suit resulted.

During the night of December 13–14 the northeast storm warning was kept displayed, although the local New York office on the evening of the 13th received word from Washington that the wind would probably turn westerly in the early morning. The northwest warning was hoisted at 10:30 a. m. of the 14th. Respondent's tug seems to have been of the ordinary harbor kind and is not known to have carried a barometer.

The Weather Bureau's local observer at New York testified in substance that one watching the wind and noting the barometer during the 13th would, if acquainted with weather lore, have expected that the wind would back round through the north to northwest.[2] The tug above referred to was one of the New York Central fleet, but at the time of this accident was with other railway tugs in the harbor operated by the Director General.

The court below (1) expressed hesitancy as to finding any fault on the part of the tug master, and finally assigned no fault against him; (2) held that it was a question in this case whether tugboat men should not use barometers, but made no definite finding on that point; and (3) finally fixed liability on respondent because, as the manager of numerous steam vessels largely engaged in handling boats without motive power of their own, it was incumbent upon the Director, or one similarly situated, to inquire at reasonable intervals of the local weather office and ascertain what disturbances were looked for or material changes in weather expected.

This ruling must rest upon an inference that, if the Director had so inquired during the evening of December 13th, he would have ascertained that the wind was expected to shift westerly during the early morning hours; he could then have communicated that fact to this particular tug in time enough to get tug and tow away from the exposed Brooklyn shore. There is no evidence tending to show how the Director or his agent could have communicated with this particular tug, or whether the information which he probably would have obtained from the Weather Bureau would have apprised him of an increase in the wind from 20 to 72 miles an hour inside of five minutes.

(1) We agree that no fault was proven against the navigator of the tug in question.

[1] (2) We cannot agree that the evidence in this case presented any question as to the duty of the individual tugboat master to carry a barometer. The equipment of vessels, whether used in harbors or on the high seas, is regulated either by tradition or statute. No statute

[1] The movement of wind from 2:30 to 2:35 a. m. was at the rate of 20 miles per hour, while from 2:35 to 2:40 the rate was 72, and in the next five minutes 84.

[2] The witness' exact words were: "Anybody familiar with storms of this character and having access to the barometer should know that (i. e., that the wind would some time shift to the northwest). Q. It would require a certain degree of technical knowledge, would it not? A. Yes."

requires a harbor tug to carry a barometer, and there is no evidence showing usage, custom, or tradition in support of the practice suggested. We do not think it lies within the province of a court to lay down such a rule as the one suggested, in the absence of evidence on the subject.

[2] (3) We have held in Nicholson v. Erie Co., 255 Fed. 54, 166 C. C. A. 382, and repeated the statement in McWilliams v. Davis (C. C. A.) 285 Fed. 312, that it is the duty of tug masters in the harbor of New York to note and give weight to the warnings of the Weather Bureau, and failure so to do is some evidence of negligence. Beyond this declaration we are not inclined to go. In this instance the only warning was against a northeast storm, and no study of that signal would have told any one that shifting boats under the lee of the Brooklyn shore was dangerous.

There can be no reason for imposing one rule upon the navigator and owner of one tug, who when out in the harbor can see only the warning, and another upon the operator of numerous tugs. The ultimate test of liability in a case between tug and tow is practically always the management of the directing tug as a towing entity, and the only just rule is to treat all tugs alike so far as general regulations are concerned. There is no evidence for taking this case out of the general regulation we have already quoted.

The master of any vessel is bound to ordinary care and the skill of his calling, and no more. The length and breadth of that measure is to some extent a matter of definition by courts. By the decisions above cited it is held to be a part of such care or skill to observe Weather Bureau *warnings* as publicly displayed. We do not deem it part of the duty of such navigator to ascertain whether the local Weather Bureau has any private information or unpublished opinions about weather to come. The storm which gave rise to the present suit caused numerous other litigations in this locality. The holdings have been uniform that, in the absence of some duty peculiarly affecting the vessel accused of fault, the storm damage was an act of God. The Hackensack (C. C. A.) 291 Fed. 73; The British Isles (C. C. A.) 264 Fed. 318; The Forde (C. C. A.) 262 Fed. 127; and there are other unreported, but similar, cases.

The decree appealed from is reversed, with costs, and the cause remanded, with directions to dismiss the libel.