## UNITED STATES v. DILLON.
### No. 4975.

Circuit Court of Appeals, Third Circuit.
March 9, 1933.

Rehearing Denied April 25, 1933.

Harlan Besson, U. S. Atty., of Hoboken, N. J., Isador S. Worth, Asst. U. S. Atty., of Riverside, N. J., and J. Frank Staley, of Washington, D. C., for the United States.

Park, Lynch & Hagen, of New York City, Smith & Slingerland, of Newark, N. J., and Charles W. Hagen and Henry C. Eidenbach, both of New York City, for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

By charter party dated December 17, 1917, Philip F. Dillon chartered a barge to the United States, with the customary provision for safe return. In accordance with the requirements thereof, Dillon manned the barge and operated it during the charter. Prior thereto, on November 27, 1917, a government tugboat had towed the barge to the government barge terminal at South Brooklyn, where some seventy to eighty other barges, under charge of their owners, were assembled. These barges were moored in

three tiers as described below. Dillon testified in reference to the government officials and the barge captains:

"Q. Now, Mr. Dillon, did Mr. Duffy (a Government official) have a man there to tie these boats up, exclusively? A. I don't think so. All the captains work together and tie their own boats up.

"Q. Then the first boat tied to the dock was done by the captain of that boat, is that right? A. We all work together in tying the boats."

He said further: "I tied it up outside the other boats." As to his own particular boat, Dillon's testimony was: "Q. What lines of tackle and what equipment did you have on that vessel? A. Plenty of rigging always." His testimony was: "I tied it up outside." Dillon's barge remained in this position and so moored until a night a week later, when the flotilla broke loose. Speaking of the latter night, Dillon's proof was:

"Q. You went to bed with the northeast wind blowing. Was it a pretty heavy wind? A. It was blowing, but not so heavy. Later it turned to a northwest wind which was pretty bad.

"Q. There was a pretty rough sea? A. There wasn't much sea there.

"Q. And your boat looked safely tied to this other vessel when you went to bed? A. Yes."

As we gather from the proofs and a sketch made by Dillon, the barges, with the exception of Dillon's, all lay parallel to the pier, in three divisions. The first, or western, division consisted of an inner barge parallel to the pier and fastened by its own lines to the pier. Alongside of this barge, and parallel to it, a second barge was fastened by its own lines to the first barge. A third barge was fastened in the same way by its own lines to the second barge. In the same way the fourth barge was fastened by its own lines to the third, and in the same way a large number of barges were so fastened to each other in a tier extending out some hundred feet from the pier. East of these barges, a correspondingly large number of barges, and extending an equally long distance, were fastened in the same way. Still east of these two strings of barges a third but smaller lot were fastened to the pier and to each other in the same way. Dillon's barge was the last or outer barge of this third lot, but instead of being fastened side to side to the barge alongside of it, it was fastened head on to its neighbor barge. In

addition to the first or western tier of barges being fastened by the lines of the first barge to the pier, the third barge of that series was fastened by a chain from it to the pier. In this way the barge remained until the night of December 13th. When Dillon went to bed on his barge, the wind was blowing twenty-three miles an hour, northeast. At about 3 a. m. of the 14th the wind shifted and a northwest gale suddenly sprang up, the wind blowing up to eighty-four miles an hour. Under stress of this hurricane, the chain broke, and the mooring lines from the head barges of the three sections to the pier gave way, and the whole flotilla went afloat. It was afterwards towed back to place, and some considerable time later Dillon's barge was found to be injured by some spiles it encountered. Dillon was paid by the government the charter rate for his barge and an insurance company paid him for the damage sustained. Having obtained an assignment of his claim against the government, the insurance company filed this libel in Dillon's name some three years after the alleged injury, in which the sole negligence alleged was that the "damage to said barge was caused by the negligence of the agents and employees of the government as a result of the negligent manner in which said barge, with many others, was moored." More particularly it charged that the flotilla "extended from the Terminal, a distance of several hundred feet, and was made fast to the dock by a single iron chain attached to a barge in the third tier from the dock." The case was referred to a commissioner, who heard the witnesses and found as follows: "I am of the opinion that these barges were moored with sufficient care to withstand any storm that might be reasonably expected to occur; they had weathered all storms that had occurred up to that time and that they would have weathered this one, if it had not attained the unusual violence that it did. I, therefore, find that the breaking loose of these barges was caused by the unusual weather condition which prevailed between the hours of two and three o'clock in the morning of December 14, 1917, and that the damage done to the "Kenneth Dillon" as a result of the breaking loose of these barges was caused by the hurricane that occurred at that time, and that the damage was caused by the elements and not by the negligence of anyone in the employ of the Government, and as damage of this nature is exempted under the Seventh Paragraph of the Agreement, the petitioner should not recover." On hearing, the court below sustained exceptions to the

472

commissioner's report; whereupon this appeal.

After argument and due consideration had, we are of opinion the court erred in sustaining the exceptions to the commissioner's report, and this for two reasons. We agree with him that no negligence was shown on the part of the government. Beyond the fact that a government tug towed Dillon's barge to the terminal, there is no proof that any representative of the government oversaw, directed, or controlled its mooring. Moreover, here were seventy or eighty barges, each moored by its own captain. They saw the way the boats were tied up, saw them stay moored for a number of days, and they neither then called attention to alleged improper mooring, nor was any one of them called to prove such was the case. The commissioner was justified in his finding as to mooring and also in the fact that the breaking loose of the flotilla was due to a great and unusual gale. This same storm was considered in litigation in the Second Circuit and its unusual and unlooked for character there observed. In that regard we note that in O'Brien Bros. v. Director General of Railroads (D. C.) 287 F. 543, Judge Ward said: "The wind, which had been since 5 p. m. of the 13th blowing from the northeast, of no unusual force and in a direction not dangerous to the boats, suddenly shifted to northwest, blowing right on them with a force of 72 miles between 2:35 and 2:40 a. m., and 84 miles between 2:40 a. m. and 3:05 a. m., when it began to drop off again." In reviewing that case, Judge Hough, speaking for the Circuit Court of Appeals (O'Brien Bros. v. Davis, 300 F. 84), says: "The wind changed from a moderate easterly movement to a storm of most unusual violence, blowing from the northwest, and this shift of wind was almost instantaneous."

In the face of such a fierce storm as this, which arose instantaneously and unexpectedly and which no one, including the weather bureau, had any cause to anticipate, we agree with the court in 300 F. 84, 86, supra: "The storm which gave rise to the present suit caused numerous other litigations in this locality. The holdings have been uniform that, in the absence of some duty peculiarly affecting the vessel accused of fault, the storm damage was an act of God."

So regarding, the case is remanded, with direction to enter a decree dismissing the libel.