## THE TRENTON.

### In re O'BRIEN BROTHERS, Inc.
### No. 15264.

District Court, E. D. New York.
April 7, 1938.

Foley & Martin, of New York City (James A. Martin and Christopher E. Heckman, of New York City, Esqs., of counsel), for petitioner.

William C. Chanler, Corp. Counsel, of New York City (Willard M. L. Robinson and John T. Condon, both of New York City, of counsel), for claimant.

BYERS, District Judge.

The petitioner seeks limitation of and exoneration from a claim for damages occasioned by the striking of its derrick lighter Trenton against the Steeplechase pier at Coney Island on the night of December 19, 1936.

The vessel is 102 feet long and 33.5 feet in beam, and has a depth of 7.5 feet. Her displacement tonnage is 300; she is without power, and carries hoisting machinery with gear and engines.

She was moored to three anchors as follows: A stern anchor of 3½ tons, out about 1,000 feet from the jetty, and port and starboard anchors of from 1 to 1½ tons; they were lashed to a buoy by ¾ inch steel hawsers called straps, and the anchor lines on board the vessel were 7 and 6 inch hawsers, respectively, made fast to the anchor straps. It is not disputed that all the manila hawsers were new, good lines. The anchor buoys held up the straps and thus there was no chafing of the manila lines on the bottom.

The Trenton moved in and out on her stern anchor line, made fast to stone scows which were carrying stones for several jetties on Coney Island beach. The derrick and a scow came alongside the jetty and then the derrick discharged the stones to the jetty from the scow by the use of a derrick arm and chain slings.

The work had been going forward for a matter of two months or so in this way, and the stone scows were taken to and from the job by tugs which could not approach nearer than 500 feet from the beach because of their draft. When the cargo of a scow had been discharged, the derrick moved it out, using her stern anchor line under her own engine power, and at about 500 feet off shore the scow would be taken in tow by an O'Brien Brothers tug.

The work was prosecuted as the weather permitted, and it was customary to knock off at between five and six o'clock in the afternoon of weekdays except Saturdays when the quitting hour was 4:30 P.M. If conditions permitted, the work was carried forward on Sundays.

On the evening of December 18th, the Weather Bureau issued a storm warning by radio at 9:41 P.M.:

"Advisory 10 P.M.: Northeast storm warnings ordered 10 P.M. from Delaware Breakwater to Cape Hatteras, N. C. in-

creasing northeast to east winds becoming strong with rain Saturday."

The City deems that warning important, in spite of its application to a territory not presently involved.

At 9:30 A.M. on the morning of Saturday, December 19th, the following storm warning was issued by the local Weather Bureau:

"Hoist northeast storm warnings 9:30 A. M. north of Delaware Breakwater to Boston, Mass. Disturbance over southeastern states will probably develop and move northeastward accompanied by strong northeast winds and gales with rain or snow."

Knowledge of that warning is brought home to the petitioner.

The shore line of Coney Island runs about east and west and forms a lee for vessels as against northerly and northeasterly winds.

Directly north of Steeplechase pier, Coney Island is closely built, and the testimony in the case is clearly to the effect that a northeast wind rising to the force of 30 miles an hour creates an undertow after blowing some hours, but that easterly and particularly southeasterly winds are required to create a choppy and dangerous sea.

The wind movements and average velocity on this day, according to the official reports of the Weather Bureau, were from 12 o'clock midnight until 10:00 A.M. northeasterly winds having an average hourly velocity of from 12 to 8 miles. From 10:00 to 11:00 A.M. the wind was easterly and of a 10-mile average velocity, and from 11:00 to 12:00 it was northeasterly at 12 miles, and so continued until 2:00 o'clock, dropping during the last hour to 9 miles; then it shifted into the east and there continued until 11:00 P. M. with an hourly average of 10, 15, 18, 20, 21, and rising to 24 between 8:00 and 9:00, 25 between 9:00 and 10:00, and it apparently got into the southeast at 9:42 with a velocity of 28. Between 10:00 and 11:00 it was of a velocity of 28 and still in the east, and between 11:00 and 12:00 it shifted to the southeast with a velocity of 32 rising to 38. It was during the latter hour that the Trenton's moorings parted; that is, the strap on the starboard anchor snapped, and the stern and port manila lines parted.

As a result, the lighter drifted westerly and hung up on the end of the Steeplechase pier, doing the damage for which the claim has been filed. Later apparently she freed herself and drifted onto the beach.

The claimant asserts that limitation should be denied because the petitioner has failed to establish that the striking of the pier occurred without negligence upon its part; or that the occurrence was without the knowledge or the privity of the petitioner.

These contentions render it unnecessary to discuss any question of seaworthiness of the Trenton, because the evidence is quite clearly in the affirmative as to that.

The mooring of the vessel was entirely adequate and the weight, position and rigging of the anchors are not criticised by the claimant, nor the adequacy of the lines employed to hold the Trenton in position. Whatever argument there was at the trial on this branch of the case was wholly unsupported by the evidence, which is clearly to the effect that in these respects the petitioner's case was proven, and it is so found.

The question of negligence involves the alleged failure on the part of the petitioner to take precautions in response to the storm warnings, by having the Trenton removed to a safe place before the force of the storm broke, and that aspect of the evidence will be discussed.

It is undisputed that, at about half past two in the afternoon of the day in question, the captain of the Trenton started ashore to telephone for a tug to remove the Trenton and the stone scow Ambrose Light, because at about that time it became apparent that the unloading of the latter could not further proceed in safety. While the captain, Lindholm, was in the act, the tug Henry O'Brien arrived and made fast to the end of the Steeplechase pier, so that Lindholm returned to his vessel.

The derrick at once hauled herself out on her stern line to about 500 feet off shore where there was sufficient depth for the tug to take the half unladen stone scow in tow.

The evidence for the petitioner, namely, the testimony of the mate who was in command of the tug, the captain of the Trenton, the fireman, and a deckhand

Burns, is that the mate of the tug, who was in charge, stated to the captain of the Trenton that he would take the scow around to Sea Gate and return and then take the Trenton in tow bound for the same haven. His explanation of why he felt that it was safer to do this than to attempt to tow both vessels in one operation seems plausible.

■ The proctor for the City does not believe this testimony, but it is uncontradicted and is not inherently improbable, and the court therefore accepts it as true.

■ It is argued by the City that, in view of the storm warning, the petitioner should have anticipated the weather conditions which actually arose later, and· that the Trenton could not lie safely at anchor for many hours, and that, if need be, two tugs should have been sent as early as three o'clock in 'the afternoon; that this would have been wiser results from the inability of the tug that did come, to return to the Trenton and tow her away in safety. Thus again is hind sight relied upon to prove an undisputed thing.

The argument is met, however, by an understanding of the storm warning itself, which has been quoted; it was the shifting of the wind into the east and later into the southeast that really brought about the parting of the anchor lines which resulted in damage to the pier.

In passing judgment upon the petitioner's handling of the situation, it is difficult to understand just why a shifting of the wind such as did occur should have been anticipated. The position of the Trenton was not an exposed one until the wind blew strongly in from the southeast, and that did not occur until about ten o'clock; why any one should have expected it then to go into the southeast, instead of back to northeast as the forecast was, has not been made to appear.

As to the towing of the stone scow to Sea Gate, there was an ebb tide prevailing from around noon until about six o'clock, which was opposed by the easterly wind, making up a rough and choppy sea, which delayed the towing, and indicated that it should be undertaken separately as to the scow and the derrick lighter, since a wide turn had to be taken around Norton's Point because of shoal water inshore.

Between seven and eight o'clock, the Henry O'Brien started back for the Trenton into the teeth of the east wind and the heavy seas, and found it impossible to continue; accordingly she returned to the petitioner's yard at Rosebank, Staten Island, and there stood by throughout the night under steam, waiting for the wind to shift back to the northeast, under which condition she could have safely returned and taken the Trenton in tow.

There is no testimony to show that prudent navigation was opposed to the decision of the mate who was in command of the tug to tow the vessels separately, and later to abandon his attempt to go back to the Trenton; nor has it been shown that his tug could have returned from Rosebank to get the Trenton at any time prior to her actual coming adrift.

The City's further argument is that the Henry O'Brien did not respond originally to any special instruction to ' go to the place where the Trenton and the Ambrose Light were operating, but merely made· a routine Saturday afternoon call for the stone scow. The tug's testimony is to the contrary.

If the City's argument is sound, although opposed to the showing that work at the jetties did not ordinarily stop until 4:30 on a Saturday afternoon, it would not, alter the fact that the tug was there and that her acting master stated that he intended to move both the Trenton and the scow. The fact that the tug's arrival took place at about three o'clock, and that the stone scow was hauled out when but half her cargo had been unladen, suggests the acceptance of the testimony that the tug was sent at that hour for the reason stated by the petitioner's witnesses. If this is so, the question dwindles down to a mere appraisal of the extent to which precautions actually were taken to remove these vessels from a place of possible peril.

Again recourse must be had to the fact that the storm warning did not teach the probability of the hauling of the wind into the east and later into the southeast.

Had that been the warning, the petitioner might well be held to have failed to perform its duties by sending only one tug, because it would not have been justified in calculating too closely the probable hour when heavy seas could have been expected to sweep in from the southeast.

The only criticism that occurs to the court is based upon the failure of the mate of the tug to report to the dispatcher, when he telephoned him at about eight o'clock from Sea Gate, of his intention then to return for the Trenton, that he might not be able to accomplish that purpose, and that another tug should also be sent; he had just been through the troubled waters between Steeplechase pier and Norton's Point, and perhaps should have known that he could not make the return trip in safety; however, it must be borne in mind that his testimony is consistent with a belief upon his part that the wind would go back into the northeast according to the weather forecast, and it would be a counsel of perfection to hold the petitioner liable because the mate did not foresee the point of the compass from which the heavy blow actually would come.

The testimony is clear that, until about ten o'clock, the Trenton was riding the waves caused by the easterly wind in safety, and it was not until about eleven that the seas began to come over her stern from the southeast; they broke in the fire-room door on the main deck aft and, because of their strength and height, the vessel began to roll and pitch so that the strain upon the anchors caused the parting of the lines which has been stated; it may be doubted if any tug of the proper draft to approach within 500 feet of the shore could have gotten in to the Trenton after ten o'clock that night.

Upon the testimony as a whole, it is thought that there was no negligence shown on the part of the petitioner in trying to care for the Trenton, and that, on the contrary, reasonable precautions were taken.

■ The petitioner was under contract with the City to hold the latter harmless (a) from injury to property resulting from its negligence or carelessness in the performance of the work; and (b) from loss or damage arising out of the nature of the work to be done. As to the latter, it is thought that damage to the structures upon which the work was being done was that against which the petitioner engaged to hold the City harmless; and that as to the former, no negligence or carelessness has been shown on the part of the petitioner.

■ Assuming that the burden of proof lay with the petitioner to show its freedom from negligence, it is concluded that it has borne that burden and is entitled to exoneration. The Cullen, 2 Cir., 62 F.2d 68; The Headlight, 2 Cir., 300 F. 84.

Settle decree, and findings if desired.