## SIDNEY BLUMENTHAL & CO., Inc., v. ATLANTIC COAST LINE R. CO.

### No. 66.

Circuit Court of Appeals, Second Circuit.

Nov. 16, 1943.

Theodore L. Bailey, of New York City, for appellant.

Eugene Underwood, of New York City, for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up upon a judgment for the defendant in an action at law, tried to a judge without a jury. The plaintiff was the owner of a parcel of cotton shipped from North Carolina to Connecticut, and lost in the harbor of New York on the 21st of September, 1938, while en route from Greenville to Brooklyn, upon a car float of the New York, New Haven and Hartford Railroad, an intermediate carrier. The only question is whether the loss was due to the carrier's negligence, or to an act of God. The cotton shipped in a car of the initial carrier, reached Greenville on the afternoon of the 21st. Greenville is the terminal of the Pennsylvania Railroad, and the car was run onto a car float of the New Haven Railroad along with a number of other cars; twelve loaded, and two empty. Another car float was loaded at the same time, and a tug of the New Haven Railroad took both floats in tow at 2:15 P.M., and started across the Upper Bay. At 2:45, when one or two thousand feet away from the Long Island shore, a sudden and great increase in the wind, accompanied by high seas parted the tow lines of both floats; and six or seven cars upon the float which carried the plaintiff's cotton went by the board. The floats, when loaded, draw about fifteen feet and had a freeboard of six feet; the spot where the accident happened is within the three-fathom depth contour. The plaintiff does not charge the carrier with any error in navigation, but only because the flotilla started out in the face of the weather as it then was, and of storm warnings with notice of which it was chargeable. The judge found the carrier free from negligence, and dismissed the complaint.

The centre of the hurricane of September 21, 1938 passed more than one hundred miles east of New York—about over Block Island and Watch Hill. Nevertheless it caused high winds and heavy seas

in the harbor, seas particularly heavy in the shoal water through which the tug was passing when the floats broke loose. The decision centers upon what warnings the carrier should be charged with. Upon this appeal it insists that there are no disputed questions of fact, and that, as the decision below was not "clearly erroneous," we have nothing to review. That depends upon whether we are to call the proper standard of care a question of fact. In cases tried to a jury it is indeed treated as such, although obviously it is not a question of fact, for it measures the duty and the liability which the law imposes; upon appeal in a cause tried to a judge, we think it should not be so regarded. As we view it, therefore, the cause comes before us as it did before the district judge; like him, we have only to decide what measure of care the situation imposed. In determining that we hold that the carrier is charged with notice of all information, available to those in its employ on shore, and that its liability is not limited by what the tug's master knew. That, it is true, is contrary to O'Brien Bros., Inc., v. Davis, Director General, 2 Cir., 300 F. 84, 86, where we held that the "ultimate test of liability in a case between tug and tow is practically always the management of the directing tug as a towing entity." With that statement we are in entire accord so far as any information comes to the owner after the tug has passed beyond his reach; nothing can then be charged against him except what the master, placed where he is, learns, or can learn. But we agree with Judge Ward in the same case in the District Court (287 F. 543), that when a tug touches shore or otherwise gets into touch with her owner, any information then possessed by him or available to him through ordinary care is to be as much charged against him as though the master of the tug himself had it, or could have got it. The fiction that in such a situation the liabilities are to be judged by treating the tug as a jural person, has neither reason nor authority to commend it. Pro tanto, we therefore overrule O'-Brien Bros. v. Davis, Director General, supra, 300 F. 84. What we have just said is determinative here, because the tug was constantly shuttling across the Upper Bay; on the trip before the one now in question she had left Bay Ridge at 12:25 P.M. and had arrived at Greenville at 1:25. Her master, therefore, was within reach of the carrier's shore employees for a period of fifty minutes before she put off; her fault

is to be judged by what those in charge of the carrier's fleet knew, or should have learned. An adequate system of communication with its tugs when they touch shore is as much a necessity as that they should be well found in hull and gear.

On September 19th, notice was sent out by the Weather Bureau of a hurricane, usual at that season, then in the Caribbean; but there was no reason to apprehend that it would cause trouble here. On the 20th it was known to be moving up the coast but there was still nothing ominous about it, although the glass fell steadily, though slowly, throughout the day. The first warning that could be said to occasion any concern was sent out at 3:00 A.M. on the 21st, which read as follows: "Hurricane central one A.M. E. S. T. about 225 miles south of Cape Hatteras moving rapidly north or possibly slightly east of north. Indications are that center will pass near but slightly off, Cape Hatteras within the next 12 hours, attended by dangerous gales and high tides on the coast and hurricane winds short distance offshore." Yet this too, even if known, was not enough in any way to disturb a well found tug and tow, passing back and forth across the waters of the Upper Bay. At 7:00 A.M. the Weather Bureau at the Whitehall Building hoisted a "northeast storm warning" and although that again need not have suggested suspending traffic, it did require the carrier from then on to advise itself of future developments. At 10:40 A.M. the following notice was received in New York: "Hoist northeast storm warnings nine A.M. north of Atlantic City and south of Block Island * * * Tropical storm apparently central about 75 miles east of Cape Hatteras moving rapidly north-northeastward attended by shifting gales over a wide area and by winds of hurricane force near center. Northeast or north gales backing to northwest south of Block Island to Hatteras today." We do not say that even then shipping should have stopped, but at noon two storm signals were raised which, as Admiral Knight says, "indicate the expected approach of a tropical hurricane." (P. 508, Seventh Edition.) Nor was that all, for between ten o'clock and two—only four hours—the barometer dropped .96 inches; the lowest reading in fifteen or sixteen years. The carrier had no barometer at the Greenville station, or, so far as appears, anywhere else; a fault on the part of one engaged in such extensive maritime oper-

ations. When the double signal was hoisted at noon, the following notice was issued by the Weather Bureau: "Change to whole gale warnings 11:30 A.M. Atlantic Coast north of Virginia Capes to Sandy Hook, New Jersey; tropical storm central 10:00 A.M. about 100 miles east of Virginia Capes moving rapidly northward or slightly east to north. It is attended by shifting gales over a wide area and by winds of whole gale force over a considerable area around center; northerly winds along the New Jersey, Maryland and southern Delaware coasts will likely increase to whole gale force this afternoon and back to northwest and diminish tonight." That was more than two hours before the tug set out from Greenville with her tow. The wind movement during that period was 38 miles between 12:00 and 1:00, with a maximum of 43; and 46 miles between 1:00 and 2:00, with a maximum of 51. It was in the face of this information that the tug set out; and we hold that a tug so laden and bound over such shallow water had reason to anticipate what she in fact encountered: an hourly wind movement of 60 miles with a maximum of 69, and plunging seas which might break her lines. The master's description of the wind at the time of the accident fits well with these conditions.

■ In all actions for negligence the decision depends upon the risk imposed upon the person who eventually suffers, matched against the prejudice or expense necessary to avoid it. In this case that prejudice and that expense were no more than the delay of a few hours; on the other hand the risk was most substantial. We should indeed have been influenced to an opposite conclusion, had the experienced watermen who manned the tug accepted the risk with full knowledge of all the facts; but they were never advised, and we have no reason to suppose that we are pitting our judgment against theirs. Indeed there were other watermen in the harbor who withdrew all their shipping that afternoon. The carrier answers that the hurricane was an act of God—to which we agree, but to which we answer that an act of God is no excuse, if negligence be shown. Next, it says that at 2:15 the whole gale or hurricane signal was hauled down, the northwest storm signal was hoisted, and the Weather Bureau received the following message: "Change to northwest storm signals 2:00 P.M. Virginia Capes to Sandy Hook, N. J. Tropical storm central 12:00

noon about 75 miles east-southeast of Atlantic City moving rapidly north-northeastward, with no material change in intensity since morning. Storm center will likely pass over Long Island and Connecticut late this afternoon or early tonight attended by shifting gales." We cannot see that these changes furnished any excuse. In the first place the message was received and the hurricane signal taken down after the tug had left the pier and at the moment when she was setting out; it was then too late to stop her. Second, like all such notices it was a forecast, and would tell nothing about the weather during the next thirty minutes, which was all that counted. Third, the fact that the storm center would pass over Long Island was of small consequence. As hurricanes come into higher latitudes they extend their diameter, though it is true with decreasing velocity; a hurricane or storm of full gale force passing over the eastern end of Long Island would be likely to be attended by extremely heavy winds in the harbor of New York.

Judgment reversed; new trial ordered.