ADOLPH M. ENGEL, Respondent, *v.* CHESTON SIMMONS and Others, Copartners Doing Business under the Firm Name and Style of SIMMONS & SLADE, Appellants, Impleaded with JESSE BAAR, Defendant.

First Department, November 7, 1930.

*John L. Lockwood,* for the appellants.

*Albert Adams* of counsel [*Samuel Meyers* with him on the brief; *Morris & Samuel Meyers,* attorneys], for the respondent.

McAvoy, J. Plaintiff had a judgment at a jury trial for damages for breach of a promise by the defendants, who are stockbrokers, not to call upon plaintiff for any margin during the running of his account; for indemnity for such losses as he sustained in his trading in the securities dealt in on margin, and alleged damages because of defendants' selling out plaintiff, contrary to his instructions, and without his consent.

The proof showed that in May, 1922, plaintiff had certain securities pledged to a bank for $32,000, and his son-in-law thereafter advanced to him $15,000, for which he turned these securities over to the son-in-law. The son-in-law went to the office of the defendants, where he met the defendant Baar, who was at that time a customers' man in charge of the quotation board room. Behind a partition in this room were the offices of the members of the firm, in which plaintiff's witness Meyers said that he met defendant Farrington, a partner, and stated that he had been recommended by the bank and wanted to make some kind of a special arrangement about it. Farrington said he would turn him over to Baar and " whatever Mr. Baar does is all right for me." He stated that Farrington took him into the quotation room and introduced him to Baar.

Although the versions of the meeting differ slightly, there is not any material variance in respect to this meeting with the partner of the firm.

The conversation which then ensued with Baar was had without any inquiries as to Baar's position with the firm or his duties. Meyers was an attorney who had had some experience in dealing with securities, and had never made an agreement with stockbrokers of the kind to which he testified.

He says that he told Baar that his equity in the securities at that time was about $10,000, and he wanted to get $15,000 out of them, and that his business was such that he wished to have Baar trade in his account just as Baar pleased. He assured Baar that he did not want to lose what he then had in the account, and Baar said he thought he could make money in the account; " I am going to show you what I can do." Meyers then said: " Now that also

means no margin calls if you handle the account. * * * . No margin calls, since you are handling the account you can sell out at any time, buy any time, close it out and wipe it out; no margin calls. I cannot put up any more money. I am trying to get money out of the account, not to put money into the account." Baar answered: " That is all right; leave it to me." Nothing else was said specifically relating to the essential features of the contract relating to a guaranty against loss, and not calling for margins. There was no agreement as to what was the basis from which indemnity for loss was to be determined. Meyers had said that there was $10,000 equity in the account, but he had nothing with him to show that that was the correct amount, and Baar said nothing. The securities were not yet delivered to Simmons & Slade, the defendants; they were not received until two days later, and no value as of that date as a basis for a guaranty was even discussed. There was no further talk, and no written communication thereafter, and on May 15, 1922, the securities of the plaintiff at the Fifth Avenue National Bank were delivered to defendants, who paid the bank's lien of $32,000.

The account was thereafter active from time to time down to September 28, 1922.

Baar claims that he consulted Meyers about every transaction he put through, and never exercised any discretionary authority over the account. There was no denial that Baar always consulted Meyers after May 29, 1922.

While the account ran, confirmation notices of transactions were sent to Meyers by the defendants, each bearing notice that plaintiff and defendants agreed that transactions were subject to the rules and customs of the Stock Exchange; that marginal business was subject to sale of securities without notice when necessary for the broker's protection, and that securities in margin accounts might be repledged by the stockbrokers. These confirmations were twenty-nine in number, and covered nearly all the transactions from May 15 to September 28, 1922, in the plaintiff's account.

There were also monthly statements of the account sent to Meyers, in which interest charges were made, totaling over $800, and in which the purchases and proceeds of sale were increased or reduced by the commissions and transfer charges, and in taxes. These statements showed losses on sales of securities during the running of the account.

The first monthly statement showed a loss of over $200, and other statements exhibited transactions in which losses occurred. All of these statements of accounts were sent to Meyers, under authorization received from the plaintiff to the defendants, and

were accepted by him without any protest that his contract with the defendants made the charges of such losses improper.

His explanation as to these entries of losses in his account, and the significance of these monthly statements (if his story were true that he was not to be charged with losses) is totally inadequate.

Baar denied that he had any talk with Meyers about not calling for margin, or guaranteeing against loss, but only talked as to operating the account in his discretion.

Farrington said that nothing was said to him except as to running a discretionary account for the plaintiff; that there never was any reference to him by Baar about agreement not to call for margins, or to guarantee against loss, and that he never knew that plaintiff made any such claim until this action was begun.

We do not think that there was evidence upon which the jury could find that Baar had any authority to make the contract claimed by plaintiff, or that, if he did not have such authority, his acts were ratified by the defendants. Ratification can only be based upon the knowledge of the principal that such a course of business was being carried on, and no proof exists that any of the partners knew that there was any such agreement in existence. Besides which, the position of the customers' man, Baar, gave him no such authority as would warrant the customer in concluding that he could make a contract guaranteeing plaintiff against loss, or agreeing not to call upon him for any further margin; and to have had such a contract (assuming the authority of Baar) with Meyers in behalf of the plaintiff, there must have been an agreement entered into as to each of the terms of the contract — some of which could not have had a basis at the time of the alleged agreement, since even the sum upon which a loss could be based was not known accurately to the participants in the alleged contract.

We conclude that the evidence does not support the conclusion that any such contract, as claimed by plaintiff, was made. All the evidence upon which plaintiff relies in his claim of guaranty against loss, when reduced to its exact terms, is a statement by Meyers that he did not wish to lose what he had in the account, in reply to which Baar stated that he could make money in the account and would show what he could do. These expressions do not carry any such import as the guaranteeing against loss of every transaction in the account, and the denial of the brokers' right to call for margin.

We find, therefore, since the evidence was insufficient upon which to found a contract upon the terms of which the parties agreed, and there was no proof that this employee had any authority to bind the defendants by a contract to indemnify plaintiff against

loss (since even a partner could not have made such an agreement binding the firm), unless such act was manifestly necessary and a customary incident of the carrying on of that business — as to which there is no proof — that the judgment was improperly rendered and should be reversed, with costs, and the complaint dismissed, with costs.

DOWLING, P. J., MERRELL, FINCH and SHERMAN, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs.