588 F.2d 1
 In the Matter of the arbitration between KARAVOS COMPANIA
NAVIERA S. A., disponent owner of the M/V Swede
Tonia, Petitioner-Appellee,
v.
ATLANTICA EXPORT CORPORATION, Charterers of the M/V Swede
Tonia, Respondent-Appellant.
 No. 317, Docket 78-7423.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 28, 1978.
Decided Nov. 15, 1978.
 
 John D. Kimball, New York City (Healy & Baillie, New York City, Jack A. Greenbaum, New York City, of counsel), for respondent-appellant.
 Jonathan Friedland, New York City (Poles, Tublin, Patestides & Stratakis, New York City, John G. Poles, New York City, of counsel), for petitioner-appellee.
 Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This is an appeal from an order of the District Court for the Southern District of New York under §§ 4 and 5 of the Federal Arbitration Act, 9 U.S.C. §§ 4, 5 (1976), directing Atlantica Export Corporation to submit to arbitration of a claim by Karavos Compania Naviera, S.A. (Karavos), for breach of an alleged agreement to charter its vessel M/V Swede Tonia. The agreement, never signed but alleged to have resulted from telephone and telex exchanges by various ship brokers described below, would have incorporated the New York Produce Exchange Form Time Charter which provides for arbitration of disputes between "Owners and Charterers." Atlantica's defense was that it had not authorized anyone to charter the Swede Tonia on its behalf and hence was not a "party" to any written agreement to arbitrate within § 4. It is agreed that this issue was one for determination by the court.
 
 
 2
 The Dramatis personae, in addition to the petitioner Karavos, are as follows:
 
 
 3
 1) Atlantica Export Corporation (Atlantica), a "branch" of a Philippine corporation called Atlantica Corporation, is a California corporation headquartered in San Francisco. It is a trading company owned by John Lim, its president, and his family.
 
 
 4
 2) Atlantica Export Suppliers Corporation (Suppliers), with an office in New York City, is a sales affiliate of Atlantica whose prime function is to take care of the Middle East market. Half its stock is owned by Jose Grajo, Jr., its president, Jessie Coronel, its executive vice-president, and Luis Uranza, Jr., a vice-president and director; the other half is owned by John Lim, Domingo Yao and Carlos Tejuco, the last being vice-president and secretary-treasurer of Atlantica.
 
 
 5
 3) International Resources Exchange, Inc. (Resources), a New York corporation, also with an office in New York City. It is a trading company represented in the transaction here at issue by Raymond Kenard and Alfred Repetti.
 
 
 6
 4) Ottar Grundvig, president of Grundvig Chartering, Inc., a New York ship broker, alleged by petitioner to have been acting on behalf of Atlantica.
 
 
 7
 5) Edward Licho, an employee of Federal Motorship Corporation, also a New York ship broker, who fixed the charter with the agent of the shipowner upon instruction from Grundvig.[1]
 
 
 8
 6) John Vatis, an employee of Trans-Ocean Steamship Agency, Inc., a New York ship broker acting on behalf of the shipowner.
 
 
 9
 The line of authority relied on by Karavos runs:
 
 
 10
 The dispute is over the existence of the link between Atlantica and Resources (or Repetti) necessary to bind Atlantica.
 
 
 11
 The case was presented in a manner that must have been most confusing to the district judge. One would have supposed that, when the trial began on April 21, 1977, Karavos' first witness would have been Repetti, if his testimony would have been favorable, or, if not, Grundvig, who had been in direct touch with him. Instead it was Licho who, as the diagram indicates and his testimony was to show, knew little about Repetti's status save what Grundvig had told him. When Licho's testimony was concluded, Atlantica's counsel, a San Francisco lawyer, asked whether petitioner was resting. Its counsel answered in the negative, saying he was "going to bring in or try to bring in Mr. Grundvig" and also that:
 
 
 12
 If I can locate this man Repetti, whoever he is, I will subpoena him. I want to get to the bottom of this.[2]
 
 
 13
 To fill in the time before petitioner could produce additional witnesses, respondent then called Tejuco. At the conclusion of his testimony both parties rested. After an off-the-record discussion on the possibility of settlement, the court announced that it would reserve decision, awaiting a letter from counsel.
 
 
 14
 About six weeks later the court was informed that a settlement could not be reached and that petitioner asked to reopen its case to have Grundvig testify. When trial resumed in the afternoon of Tuesday, July 5, present counsel for respondent was substituted. He asked, among other things, that the hearings be kept open so that Repetti could be given an opportunity to testify.[3] Counsel said that Repetti had offered to testify without need of a subpoena but could not attend that day; that counsel had promised that, after making the request of the judge, counsel would "get back to" Repetti and "see what he had to say." The judge agreed to hear Repetti if but only if he could be in court that afternoon so as to be heard when Grundvig's testimony had concluded. When Grundvig ended his testimony, at 4:55 P.M., respondent's counsel renewed his "request to have the opportunity to examine Repetti." Expressing justifiable impatience that counsel had not telephoned Repetti during the afternoon, the judge directed him to do so. When counsel reported that Repetti had "left town and will not be back until Thursday at the latest," the judge closed the hearing.
 
 
 15
 The imbroglio that brought this case to court began about the middle of September, 1976, when, according to Grundvig, he "was introduced to a Mr. Raymond Kenard of International Resources Exchange Corporation of New York City through a friend . . . ." During an ensuing luncheon Kenard explained to Grundvig "that his company represented various European cement manufacturers and that within a short time his clients, to whom he sold the cement, would require transportation ships, ships to transport the cement to the destinations and that he would keep in touch with me." At the start therefore the buyer was to be the charterer. Grundvig continued that around September 20 Kenard called to explain that Atlantica was about to conclude a contract to ship cement, starting with about 160,000 metric tons, from Spain to Saudi Arabia and that Kenard would call him back as soon as all formalities and letters of credit were in order. Grundvig may still have believed that Detrick Corporation, the ultimate buyer of the cement for use in Saudi Arabia, would be the charterer; in any event there is nothing to indicate that he clearly ascertained what Atlantica's role in the transaction was to be.
 
 
 16
 Grundvig next testified that about September 27 or 28 Kenard called again and said he should now telephone Atlantica in San Francisco and "speak with a Mr. Repetti, who would give me all details of the shipping requirements." According to Grundvig, Kenard told him that Repetti, who in fact was Kenard's associate in Resources, was "part of the Atlantica Export Corporation organization" and Grundvig thought until mid-October[4] that Repetti was an Atlantica employee. However, he made no endeavor to find out anything about this from Atlantica, although shipment of 160,000 metric tons would have involved very large charter hire. On September 29 Grundvig called Repetti at Atlantica's office in San Francisco. Repetti told him that Atlantica would require ships to transport 160,000 tons of cement from Spain to Saudi Arabia, with loading of the first ship to start not later than October 15 but preferably October 10, and authorized him to find a vessel for this. While the record is not altogether clear how much the first shipment was to be, apparently Repetti talked in terms of 15,000 metric tons. According to Grundvig, Repetti told him that the charterer would be Atlantica and that they were "first-class charterers." Grundvig then called Licho who shortly came up with the Swede Tonia. Grundvig thereupon sent a telex to Repetti in Atlantica's San Francisco office "confirming our discussions with Mr. Kenard" that "our owners friends will nominate a vessel tomorrow" that would meet the time and place requirements. The telex promised that the full terms and conditions including required references would then be telexed but that these were expected to be the same "as per discussions with Mr. Kenard." Grundvig's notes show many discussions of the terms of the charter with Mr. Kenard,[5] which at least show Grundvig's awareness that Resources had a substantial interest in the charter.
 
 
 17
 According to Grundvig he again called Repetti on September 30 and submitted the Swede Tonia. Repetti allegedly authorized him to offer firm through broker channels, which he did. The owners asked for financial references for Atlantica; after more calls, Repetti gave the name of a Mr. Grispy of the Bank of America, International Division in San Francisco.[6] Since it was late in the day the owners requested an extension of time until October 1 at 10:00 A.M. to check on Atlantica's responsibility. Grundvig extended the offer and confirmed this by a telex to Repetti at the Atlantica office. Grundvig sent two more telex' to Repetti on October 1. The first confirmed the charter subject to the owners' accepting the charters after contacting Mr. Grispy; for the first time this telex gave Repetti some financial details about the charter, notably $3,400 per day charter hire. Grundvig also offered to act as "your operating agent" and promised to submit a contract to Mr. Kenard. Later in the day Grundvig telexed Repetti that the owners had reconfirmed the fixture of the Swede Tonia.
 
 
 18
 Grundvig's testimony, if the judge credited it as he was entitled to do, showed that Repetti had authorized him to charter the Swede Tonia on Atlantica's behalf. What it did not do was to provide any evidence, except for the presence of Repetti in Atlantica's office and his receipt of telex' and his receiving and making telephone calls there, that Atlantica had authorized this or sufficiently created an appearance of authorization to warrant Grundvig in assuming that it had. The only other evidence on this offered in Karavos' direct case, except for Licho's recollection of a meeting in Suppliers' office, of which more hereafter, was Licho's testimony to a one-minute telephone call he made to Atlantica's San Francisco office at 4:30 P.M. on September 30. Licho asked "for a gentleman there" whose name he professed inability to recall. Licho asked with what bank Atlantica did business and was given the name and number of the Bank of America, International Division, in San Francisco and the name of "a Mr. Hugh Grindy or maybe Grinsby." Licho relayed to the owner's broker this information, which Grundvig was also obtaining from Repetti in fact had obtained long before from Kenard, see note 6 Supra. If, as seems likely, the man to whom Licho spoke was Repetti, this testimony added nothing. After a recess in which Licho's recollection was "refreshed", he testified to other information about Atlantica supplied by the unnamed person. The judge struck this as unworthy of belief.
 
 
 19
 Licho also testified that at Grundvig's request he attended a meeting at Suppliers' office on October 6.[7] Present were Grundvig,[8] Licho, Kenard, Repetti, who was identified to him as an officer of Resources, and Coronel, Uranza, and Grajo of Suppliers.[9] By this time Licho had sent Grundvig the formal charter party for signature by Atlantica; Coronel had this on his desk. A rather heated conversation ensued between Coronel, Grajo and Repetti. Coronel said "that he was not going to let his corporation sign this contract because it was a high rate, high price for this vessel." Repetti told Coronel to stay out of the matter "because the fixture was done with the San Francisco office of Atlantica." A call was placed to Tejuco in California, about which Tejuco later testified in detail. Licho claimed that at the end of the conversation Repetti apologized for what was happening and said that "Now everything is in order" which it manifestly was not. On October 8 Grundvig sent Licho two telex' describing a new arrangement purportedly proposed by Repetti under which Resources would be the charterer. These salvage efforts of Repetti's aborted, whether because Resources was unable to provide the cement or on some other ground.
 
 
 20
 Tejuco began his testimony by flatly stating that prior to October 2, 1976, Atlantica had never chartered a vessel. He denied that he or anyone else at Atlantica had ever heard of or spoken to Grundvig, Licho, Vatis, the shipowner or any representative of it. He specifically denied having received a phone call from Licho and had no knowledge that any employee of Atlantica had done so. With respect to the telephone talk of October 6, he testified that Coronel and Uranza had called to say that Repetti and others were at Suppliers' office and wanted to know if he would be willing to sign a charter party on behalf of Atlantica. Tejuco said "No." He elaborated that he was "entering into no charter party agreements" and had not authorized anyone to obtain one.
 
 
 21
 Cross-examination put some, although not much, flesh on these bones. Repetti had come to Atlantica's San Francisco office with Coronel and Grajo. Repetti "is the one who put together the supplies (sic) and the shipment of cement which Atlantica Export is selling to Detrick Corporation" at a price of $45.75 per metric ton c. & f.[10] Tejuco's version of the transaction was that Resources would obtain the cement; that Resources would then sell it to Atlantica on a c. & f. basis; that Atlantica would sell to Detrick on the basis stated; that Repetti "has the vessel"; that the anticipated cost of shipment would be $15 per metric ton; and that the profit, namely, the excess of $45.75 per metric ton over the sum of the price to Repetti, insurance, and the freight would be divided equally between Atlantica and Resources.[11] According to Tejuco, the Detrick deal fell through because "Repetti was not able to come up with the supplier of the cement." Tejuco was willing to pay shipping costs of $15 per metric ton and let Repetti keep, in addition to his equal share of the profits, any excess of that over the actual costs[12] but would not have Atlantica enter into a charter party. He denied that, during the telephone talk,[13] anyone told him that Atlantica was already committed. There is no evidence to the contrary.
 
 
 22
 In an opinion dated August 14, 1978, the judge ruled in favor of Karavos. He thought this conclusion could be supported on any one of three grounds:
 
 
 23
 1) "Based on Tejuco's testimony alone, it appears that Repetti had actual authority to obtain shipping." Further evidence of actual authority was that Coronel's only objection at the October 6 meeting related to price.
 
 
 24
 2) Atlantica "clothed Repetti with apparent authority by permitting him to work in Atlantica Export's office and use Atlantica Export's communications equipment both telex and telephone, with a view toward Atlantica Export's profitting (sic) therefrom" thereby making it reasonable for Grundvig to believe that Repetti was authorized to act on Atlantica's behalf and relieving him of any duty of investigation.
 
 
 25
 3) In addition, since Karavos relied to its detriment on Tejuco's acquiescence in Repetti's actions, Atlantica was estopped to deny Repetti's authority.
 
 
 26
 Appellant's brief on appeal vigorously challenged these conclusions, with pointed references to the record and appropriate citations. Only four pages of the argument in appellee's 30-page brief were devoted to the merits, and these were mainly an invocation of the "unless clearly erroneous" rule, F.R.Civ.P. 52(a). The two following pages were a demand for double costs, damages, counsel fees and reimbursement of expenses, 28 U.S.C. § 1921 and F.R.A.P. 38, which was frivolous in view of the serious issues appellant had raised. The remainder of the argument was devoted to a request that we reconsider our long-held view, Farr & Co. v. Cia. Intercontinental de Navegacion de Cuba, S.A., 243 F.2d 342, 344-45 (2 Cir. 1957) (Swan, J.), that an order under § 4 of the Arbitration Act compelling arbitration is appealable as a final order under 28 U.S.C. § 1291. In Chatham Shipping Co. v. Fertex S.S. Corp., 352 F.2d 291, 294 (2 Cir. 1965), we declined to reconsider this ruling, in part because a closely analogous Supreme Court decision, Goodall-Sanford, Inc. v. United Textile Workers, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031 (1957), indicated that Farr had been correctly decided. That position has not changed and we have consistently followed Farr. For a recent example see Tradax Limited v. Holendrecht, 550 F.2d 1337, 1339 (2 Cir. 1977).
 
 
 27
 Appellee's contention that "the existence of an agency relationship is a question of fact" the decision of which by a district judge must stand unless clearly erroneous, F.R.Civ.P. 52(a), flies in the face of this court's long-held position, reiterated as recently as in Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 n. 3, decided September 28, 1978, that "(t)he application of a legal standard to the facts is not a 'finding of fact' within the rule," citing In re Hygrade Envelope Corp., 366 F.2d 584, 588 n. 4 (2 Cir. 1966). The soundness of this view could hardly be better illustrated than by the instant case where the judge's decision of the "fact" of agency rested heavily on citations to the Restatement of Agency 2d which Atlantica argues to have been misapplied. Even the advocates of a broad reading of the term "findings of fact" in F.R.Civ.P. 52(a) concede that "if an error of law has impaired the judgment of the trial court on a mixed question of law or fact", the finding should be set aside 9 Wright and Miller, Federal Practice and Procedure, § 2589 at 755-56.[14] See United States v. General Motors Corp., 384 U.S. 127, 141 n. 16, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). The problem is that, particularly when the district court avails itself of the Rule's permission to file an opinion or memorandum rather than to make separate findings of fact and conclusions of law, it is often difficult to disentangle the two. See Koehler v. United States, 200 F.2d 588 (7 Cir. 1953). Our experience, going back to Judge Learned Hand's opinion in Sidney Blumenthal & Co. v. Atlantic Coast Line Railroad Co., 139 F.2d 288, 290 (2 Cir. 1943), Cert. denied, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944), convinces us of the wisdom of refusing to apply "the buckler and shield" of Rule 52(a), Horton v. United States Steel Corp., 286 F.2d 710, 713 (5 Cir. 1961), to a district judge's ultimate conclusion on a mixed question of law and fact, but rather of affixing them only to those of his findings which are of historical fact and the inferences therefrom, see Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776-78 (2 Cir.), Cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), and Esso Standard Gulf Oil Co. v. S.S. Gasbras et al., 387 F.2d 573 (2 Cir. 1967), Cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968), with the further qualification that the conclusion of the district court "will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law", Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969). Perhaps in the long run we do not come out very differently than does, for example, the Fifth Circuit with its broad reading of "findings of fact" but its qualification that these "are not insulated by F.R.Civ.P. 52(a) where they are the likely product of erroneous substantive legal standards" or "indicate that the Court was apparently laboring under misapprehension as to just what the critical issues were." Fromberg, Inc. v. Thornhill, 315 F.2d 407, 409 & n. 3 (5 Cir. 1963). It simply appears to us to be more consistent with the language of the Rule, with clarity of analysis, and with the appropriate roles of the district courts and the courts of appeals to say, as we have been doing for thirty-five years, that the application of a legal standard, whether it is a "question of law" or not, is not a "question of fact" within F.R.Civ.P. 52(a). See Weiner, The Civil Nonjury Trial and the Law-Fact Distinction, 55 Calif.L.Rev. 1020 (1967).[15] However, as so often is the case, our conclusion here would not be different if we were obliged to pronounce the talismanic words that although there is evidence to support a finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 28
 On the question of actual authority we perceive no sufficient basis for the court's statement, "Based on Tejuco's testimony alone, it appears that Repetti had actual authority to obtain shipping," if this is read, as it must be in order to have legal significance, to mean "to obtain shipping for Atlantica". Tejuco's denial of this was as straightforward as could be imagined, and the judge never found that he was not a truthful witness. Perhaps the judge was referring to testimony of Tejuco recited in footnote 8 of his opinion and especially to a passage which he underlined:
 
 
 29
 He (Repetti) did tell me he mentioned about that, but again I told him that it really doesn't matter, SWEDE TONIA or any other vessel, all I am interested to know is how much would it cost to bring the cement to Damman.
 
 
 30
 This seems to us thoroughly in line with Tejuco's oft-stated position that Repetti was to provide the shipping and that Atlantica's only interest was that it should not cost more than $15 per metric ton. As Tejuco said in the same extract, "Mr. Repetti is the one who put together the supplies and the shipment of cement which Atlantica Export is selling to Detrick Corporation," "Mr. Repetti claims that he has the supplier and he has the vessel to take care of the shipment of cement to Saudi Arabia", and "He (Repetti) has the supplier and he has the shipper, the vessel." It is true that Tejuco testified that Atlantica would pay the ship owner, but Judge Ward did not rely on this and, even if he had, the fact that Atlantica was arranging to finance a suitable charter would not, in view of the other evidence and applicable burden of proof, support the findings of actual authority to enter into a charter on Atlantica's behalf. Beyond this the court's only basis for finding actual authority is "that during the October 6th meeting at the offices of the New York Affiliate and the telephone conversation between Tejuco and those at the meeting, the Only objection voiced by Coronel was to the price." This was clear error. While price was Coronel's initial objection, and an understandable one since Atlantica's profit would turn on the excess of Detrick's payment per ton over the sum of the price to Resources, insurance and freight, Tejuco emphatically stated at that time that under no circumstances would Atlantica accept the position of charterer and that he had not authorized Repetti or anybody else to place it in that position.[16]
 
 
 31
 Beyond this a strong inference must be drawn against Karavos from its failure to call Repetti. The two people who knew best what Tejuco had authorized Repetti to do were Tejuco and Repetti. Repetti had every motive to contradict Tejuco if he honestly could, since he had clearly given Grundvig reason to think he was speaking for Atlantica and his firm might be liable for breach of an implied warranty or misrepresentation of agency if he lacked authority to do so. Restatement of Agency 2d §§ 329 and 330 (1958). Yet, despite the statement of petitioner's counsel at the first session of the trial that he proposed to subpoena Repetti since he wanted "to get to the bottom of this," he made no effort to call Repetti. Such effort as was made was by respondent's counsel. While an inference can also be drawn against respondent or could be if it had not in fact attempted to call Repetti, albeit perhaps ineptly and inappropriately[17] see United States v. Beekman, 155 F.2d 580, 584 & n. 2 (2 Cir. 1946); United States v. Llamas,280 F.2d 392, 393-94 (2 Cir. 1960); Felice v. Long Island Railroad Co.,426 F.2d 192, 195 (2 Cir.), Cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); United States v. Erb, 543 F.2d 438, 444-45 (2 Cir.), Cert. denied, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976); 2 Wigmore, Evidence § 288(c) at 169-171 (1940 ed.), the inference against Karavos is stronger since, for the reasons indicated, Repetti would reasonably have been expected to testify in its favor and because it had the burden of persuasion, see McCormick, Evidence, § 272 at 656-58 (1972 ed.).
 
 
 32
 The court's finding of apparent authority was based largely on Atlantica's having permitted Repetti to work in its San Francisco office and to receive telex' and receive and make telephone calls. We do not follow the court in concluding that this alone justified Grundvig in believing that Repetti was authorized to commit Atlantica to a costly charter, with many more to come, and relieved him of the duty of reasonable inquiry. Restatement of Agency 2d § 8, comments a & c, § 27, comment a; 2 Mechem, Agency § 1721, at 1307 (1914 ed.); Mechem, Outlines of the Law of Agency P 94, at 661-62 (1952 ed.). Grundvig had had no previous dealings with Atlantica; indeed had never heard of it. Neither had he had any previous dealings with Resources. Prior to Repetti's trip to California, he had been told that the buyer would be the charterer. Apart from Repetti's presence in Atlantica's office and use of its communication facilities, his sole bases for thinking that Repetti had authority to bind Atlantica were that Kenard allegedly told him that Repetti was an Atlantica employee a statement which, as indicated above, was not corroborated by Kenard and that Repetti told him he had authority to act. Neither of these afforded any ground for holding Atlantica. Professor Mechem stated many years ago that "(t)he authority of an agent, and its nature and extent . . . , can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself agent merely by saying that he is one." 1 Mechem, Agency § 285, at 205 (1914 ed.). See also Restatement of Agency 2d § 27, comment a, § 285; Edwards v. Dooley, 120 N.Y. 540, 551, 24 N.E. 827 (1890); National Surety Corp. v. Inland Properties, Inc., 286 F.Supp. 173, 180 (E.D.Ark.1968), Aff'd, 416 F.2d 457 (8 Cir. 1969). As Judge Levet shrewdly observed in Dr. Beck & Co. v. General Electric Co., 210 F.Supp. 86, 90 (S.D.N.Y.1962), Aff'd, 317 F.2d 538 (2 Cir. 1963):
 
 
 33
 While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority. Mechem, Agency 61 (4 ed. 1952).
 
 
 34
 Moreover, even if Grundvig had been justified in believing that Repetti was an Atlantica employee, he was bound to inquire what his authority was; not every employee of a trading company has authority to fix a time charter, let alone a series of such charters. See Seacoast Electric Co. v. Franchi Bros. Const. Corp., 437 F.2d 1247, 1249-50 (1 Cir. 1971); P. D. Marchessini & Co., (New York), Inc. v. H. W. Robinson & Co., 287 F.Supp. 728, 733-34 (S.D.N.Y.1967); People's Broadcasting Corp. v. George Batten Co., Inc., 231 App.Div. 446, 247 N.Y.S. 569 (1st Dept.), Aff'd, 258 N.Y. 551, 180 N.E. 328 (1931); Engel v. Simmons, 230 App.Div. 454, 245 N.Y.S. 384 (1st Dept. 1930), Aff'd, 257 N.Y. 612, 178 N.E. 817 (1931).
 
 
 35
 Unexplained in the court's opinion is a point we have already noted, see note 5 and accompanying text, namely, why, if Grundvig thought Repetti was an employee of Atlantica authorized to fix the charter, he continued to deal with Kenard, the originator of the venture, whom he knew to be an officer of Resources and not an employee of Atlantica. Grundvig admitted that he "kept Mr. Kenard informed more or less daily over what went on with the Swede Tonia" and understood that Kenard was speaking to San Francisco from his office. Knowing that at one time the charterer was to have been Detrick, and that Kenard's company had some sort of interest in the venture, Grundvig was under a special duty of inquiry with respect to the "switch" to Atlantica and the authority of the hitherto unknown person in San Francisco to accept this. It is worth noting that after the deal collapsed, Grundvig notified both Atlantica and Resources in a letter dated October 19, 1976, that he would claim commissions and expenses for having acted "to secure a suitable vessel For you." (Emphasis supplied).[18]
 
 
 36
 We likewise can find no sufficient basis to support the conclusion that Atlantica is estopped from denying Repetti's authority. An essential element of such an estoppel is a finding that the person sought to be charged intentionally or carelessly caused the plaintiff to believe in the authority of the purported agent or that "knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts." Restatement of Agency 2d § 8B(1). There is no evidence that Atlantica intentionally caused a belief that Repetti had authority to bind it. While Atlantica may be charged with knowledge that Repetti was receiving telex' and making and receiving telephone calls at its San Francisco office, this does not suffice to show that it carelessly caused others to believe he had authority to execute a charter on its behalf or knew that they had such a belief. On Atlantica's theory that Repetti was to provide the ship, it was altogether normal that he should be communicating with New York, and there is not a scintilla of evidence that Atlantica knew the content of the telex' or the telephone calls. Moreover, reasonableness of reliance is as essential an element for establishing liability on the basis of estoppel as of apparent authority. Berns & Koppstein, Inc. v. Orion Ins. Co., 170 F.Supp. 707, 715 (S.D.N.Y.1959), Aff'd, 273 F.2d 415 (2 Cir. 1960). Finally the court neglected another essential element of estoppel, namely, a change of position by the plaintiff. Restatement of Agency 2d § 8B(1) and (3). The Restatement defines this as "payment of money, expenditure of labor, suffering a loss or subjection to legal liability." A comment adds, Id. at 42:
 
 
 37
 It is arguable that there is no change of position merely by entering into what is believed to be an executory contract with the principal.
 
 
 38
 There is nothing in the record to indicate that Karavos suffered anything more than the loss of a presumably profitable bargain.
 
 
 39
 It may be that a fuller presentation of the facts by Karavos would have demonstrated actual or apparent authority or estoppel. It may also be that a fuller presentation would have demonstrated the opposite. We do not know, or care, whether the meagreness of the presentation was due to inability to produce anything more, to trial strategy or to overconfidence. It suffices that, having had its day in court, petitioner clearly failed to carry its burden of persuasion.
 
 
 40
 The order is reversed, with instructions to dismiss the petition.[19]
 
 
 
 [1]
 It is unclear whether petitioner claims Licho to have been a subagent of Grundvig or Vatis
 
 
 [2]
 It is hard to understand counsel's unreadiness as to these witnesses and his professed uncertainty about Repetti, since Licho's deposition had been taken on March 14, a month before the hearing
 
 
 [3]
 The reason primarily urged was the judge's suggestion during the April hearing that Atlantica and Repetti might have been engaged in a joint venture
 
 
 [4]
 Grundvig was in error as to the date since he admitted his recognition of Repetti's true role at a meeting in Suppliers' office, discussed below, which took place on or about October 6. Apparently he confused this with a later meeting in mid-October. Although the judge apparently credited Grundvig's testimony about what Kenard told him, this seems suspect for reasons developed below. Petitioner did not call Kenard to confirm that he had made the admittedly false statement about Repetti's status
 
 
 [5]
 These reflect discussions on September 20, 21, 24, 27, 28, 29 and 30. The notes for September 30 contain the remark "now switched to Atlantica Export Corp." and also the first written reference to Repetti, despite Grundvig's testimony of a telephone talk on September 29 and his telex to him of that day
 
 
 [6]
 In fact, Grundvig's notes show that he had Grispy's name as early as September 20, the date of Kenard's first telephone call to him
 
 
 [7]
 The record leaves some doubt whether the meeting was on October 5, 6 or 7. Since the exact date is not material, we will use the date October 6
 
 
 [8]
 Grundvig gave no testimony with respect to what occurred at the meeting. None of the other participants was called
 
 
 [9]
 Licho learned the names and titles of these three gentlemen from being introduced and receiving their cards. The judge noted, unfavorably, that Coronel's card, showing that he was "Executive Vice President," had been cut in an apparent effort to remove the title, The Atlantica Export Suppliers Corporation
 
 
 [10]
 Grundvig testified under cross-examination that, before Repetti's trip to San Francisco, he had talked with Repetti or Kenard about Detrick's being the charterer but that this role was later "switched" to Atlantica. See note 5, Supra
 
 
 [11]
 Tejuco admitted having seen a telex sent by Coronel on September 27 from Atlantica's office in San Francisco to "Detricorp SNJ". This refers to a shipment of 15,000 tons of cement, for which "we already made commitment with the shipowners" at a time charter rate not to exceed $2,300 per day. Detrick was offered a choice whether it would "buy or timecharter" and was asked to have a representative present at a meeting that afternoon. Tejuco asked Coronel who the shipowner was and was told this was being arranged by Repetti. There is no evidence that Repetti, Grundvig or Licho ever saw this telex or whether the meeting was ever held
 
 
 [12]
 Apparently there was doubt whether the time charter at $3,400 per day would produce costs as low as $15 per metric ton. According to Licho, when Coronel objected to the price at the October 6 meeting, Repetti and Grundvig answered that "although the price might be a little high this time, at the end it will be lower because they expected to have a cheaper rate for the following cargoes." Grundvig had explained to Kenard on September 29 that a rate of $15 per metric ton would be possible only if the ship could lift at least 20,000 tons. According to the charter party the Swede Tonia's deadweight capacity was limited to 11,455 tons. Coronel's telex of September 27 to Detrick, several days before the alleged fixture of the Swede Tonia, see note 11, had assumed a rate of $2,300 per day for a vessel with a capacity of 15,000 tons
 
 
 [13]
 Tejuco testified that he talked only with Coronel and Uranza; Licho claimed Repetti had also participated in the conversation
 
 
 [14]
 As there pointed out, the draftsmen of Rule 52(a) rejected proposals to apply the limited review of jury verdicts to findings of a judge. See Id. § 2571 at 681-82
 
 
 [15]
 The Second Circuit cases cited by appellee as holding that agency is a question of fact within F.R.Civ.P. 52(a), Cramer v. Hoffman, 390 F.2d 19, 23 (2 Cir. 1968); Music Research, Inc. v. Vanguard Recording Society, Inc., 547 F.2d 192, 195 (2 Cir. 1976), involved jury verdicts, as to which, as pointed out by Judge L. Hand in the Sidney Blumenthal case, Supra, 139 F.2d at 290, and in Hygrade, supra, 366 F.2d at 588, different considerations apply. See 9 Wright and Miller, Supra, § 2585 at 730 and § 2571 at 681-82. Another Second Circuit case which appellee did not cite, Gilbert v. United States, 479 F.2d 1267, 1268 (2 Cir. 1973), did apply Rule 52(a) standards to a finding that an attorney was expressly authorized by his client to settle a Jones Act claim, but did not consider whether such authorization raised a mixed question of fact and law. Moreover, the finding rested on considerations of credibility, a factor largely absent here. Our decision here to consider questions of agency, apparent authority, and estoppel to be mixed questions of fact and law is consistent both with the general approach long taken in this Circuit and, Gilbert notwithstanding, with our more specific discussions of the scope of review of such matters. See, e. g., United Nations Reconstruction Agency v. Glass Production Methods, Inc., 291 F.2d 168, 170 (2 Cir. 1961); Lorenz Schneider Co., Inc. v. N. L. R. B., 517 F.2d 445, 452 n. 14 (2 Cir. 1975), although we recognize that other circuits have taken a contrary view as to whether Rule 52(a) governs review of findings of an agency relationship and its scope. See, e. g., Blum v. William Goldman Theatres, Inc., 164 F.2d 192, 196 (3 Cir. 1947); Famous Knitwear Corp. v. Drug Farm, Inc., 493 F.2d 251, 252-53 (4 Cir. 1974); Gilmore v. Constitution Life Ins. Co., 502 F.2d 1344, 1350 (10 Cir. 1974); 9 Wright and Miller, Supra, § 2589, at 757 & n. 66, But see Taft Broadcasting Co. v. Columbus-Dayton Local of A.F.T.R.A., 297 F.2d 149, 152 (6 Cir. 1961)
 
 
 [16]
 The court did not disagree that Tejuco said this but believed he was not "justified in doing so."
 
 
 [17]
 Although we in no way base our decision on the judge's refusal to continue the trial so as to hear Repetti, we see no real justification for this. It was already so late that it would hardly have been possible to conclude Repetti's testimony that day; if the judge had other engagements for the days immediately ensuing, there was no reason why this simple bench trial, which had once been adjourned for three months to accommodate the parties, could not have been again adjourned to a date convenient for the judge. Repetti was not a peripheral figure but at the very center of the stage
 
 
 [18]
 An inference adverse to Karavos can also be drawn from its failure to produce evidence that it or one of its agents had in fact obtained financial information about Atlantica from the Bank of America. This would have had substantial probative value since the Bank would hardly have released such information without authority from Atlantica. Per contra failure to pursue the investigation with "Grisby" would indicate that someone was trying to avoid Atlantica's finding out that it was being cast in the role of charterer. Karavos made no attempt to take the deposition of Mr. Grinsby and offered no evidence what investigation of Atlantica it had in fact made. Significant in this context are the statements in Vatis' affidavit in opposition to Atlantica's motion to dismiss that he made "a personal investigation" of Atlantica and "reported to Petitioner"; that, after its own equally undescribed investigation, Karavos told him that it would deal with Atlantica if its president, Mr. Lim, would give his personal guarantee; that, on receiving this information, Licho reported "that the individuals with whom he dealt refused to relay the request to their president, Mr. Lim"; and that Karavos then decided to proceed without the guarantee. All this supports Atlantica's theory that Kenard, Repetti, Grundvig and Licho were keeping it in the dark as to its position as charterer
 
 
 [19]
 In a footnote to his opinion the district judge stated that at the conclusion of the first hearing when only Licho and Tejuco had testified, he was prepared to rule from the bench but granted a continuance in order to afford Atlantica an opportunity to settle. If the judge then advised counsel that he was ready to rule in favor of petitioner, which the record does not suggest, petitioner's failure to call Repetti and produce other relevant evidence, see note 18 Supra, would be less damaging, and instead of dismissing the petition, the court should afford the parties an opportunity to adduce further evidence or, if it deems preferable, direct a new trial