In the Matter of the ARBITRATION BE-TWEEN HERLOFSON MANAGE-MENT A/S, as disponent owner of a vessel to be named, Petitioner,

and

MINISTRY OF SUPPLY, KINGDOM OF JORDAN, Respondent.

In the Matter of the ARBITRATION BE-TWEEN BELSTOVE MANAGEMENT A/S, as disponent owner of the M.V. BELOCEAN, Petitioner,

and

MINISTRY OF SUPPLY, KINGDOM OF JORDAN, Respondent.

Nos. 88 Civ. 7542 (RLC), 88 Civ. 9272 (RLC).

United States District Court, S.D. New York.

May 22, 1991.

Haight, Gardner, Poor & Havens (Richard G. Ashworth, of counsel), New York City, for petitioners.

Hill Rivkins Loesberg O'Brien Mulroy & Hayden (Anthony J. Mavronicolas, of counsel), New York City, for respondent.

## OPINION

ROBERT L. CARTER, District Judge.

Each of these two consolidated petitions seeks an order, pursuant to 9 U.S.C. § 4, compelling arbitration on an alleged voyage charter. Ward Marine, a broker, allegedly agreed to the two charters on behalf of the respondent. The case hinges on whether Ward Marine had authority (or failing that, apparent authority) to do so. No written charter parties were ever signed, but petitioners allege that they and Ward concluded a fixture incorporating a pro forma charter party,[1] which includes the provision that "[a]ll disputes arising out of this contract shall be arbitrated at

---

1. Under the custom of the shipping industry, the parties typically base their negotiations on a standard form contract, called the "pro forma charter party." They negotiate on the "main terms," which may include a specification of the pro forma charter party, the names of the charterer and owner, the ship and its characteristics, the time and place of loading and unloading, freight rates, and other terms. When the parties have completed their negotiations, they are said to have a "fixture." *See* Fro.Tr. 27–30, 79–80, 126–28, 143–44; *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.,* 681 F.2d 121, 125 (2d Cir.1982).

The fixture is considered a binding contract, even if it is "subject to details"—that is, even if the less important terms of the charter party remain to be agreed upon. Moreover, a fixture "subject to details" does not create a condition subsequent that can defeat the duty to perform under the contract. Rather, it indicates an intention to continue negotiations, provided that the pro forma charter party will govern if the parties do not reach further agreement on the details. *Great Circle Lines, supra,* 681 F.2d at 126.

New York ... and be subject to U.S. Law...." *See* R.Ex. 6 & 7, clause 44.[2]

### FACTUAL BACKGROUND

All events relevant to this case took place in 1987. Most of the facts in this case can be gleaned from the telexes and other documents exchanged between the participants in the transaction.

*Persons and Entities Involved*

The Ministry of Supply of the Hashemite Kingdom of Jordan (the "Ministry"), respondent in these cases, was the alleged charterer of the vessel. The Minister of Supply, Rajai Muasher; the Undersecretary of the Tender Committee, Abdalah el Hawamdeh; and the Director of Trade, Suleiman Belbeisi, were involved in the transactions in this case.

Ward Marine ("Ward") of Washington, D.C., was in the business of representing foreign governments that needed to obtain shipping related to certain programs of the United States Agency for International Development ("USAID"). McD.Tr. 5. Ward had entered into a non-exclusive agency agreement to charter ships for the Ministry. R.Ex. 5. Donald Pressley, the President of Ward, and Karima McDaniel, a broker at Ward, represented Ward in the transactions.

World Bulkers Inc. ("World Bulkers") was a ship operator that had entered into a charter party with the Ministry through Ward to ship wheat from Texas to Jordan. World Bulkers defaulted on the charter party.

Petitioner Herlofson Management A/S ("Herlofson") of Oslo, Norway, is a ship owner that allegedly entered into a charter party with the Ministry through Ward to ship a portion of the wheat that World Bulkers was to have transported. Hudson Chartering, Inc. ("Hudson") of Yonkers, New York, represented by Bryan McNelis, was the ship broker through which Ward arranged the transaction with Herlofson. Sal Gambino of S.G. Trading ("S.G.") had put Ward in contact with Hudson. Joachim Grieg and Co. ("Grieg") of Oslo, Norway, was the agent for Herlofson with whom Hudson transacted business.

Petitioner Belstove Management A/S ("Belstove") of Oslo, Norway, as owner of the M.V. Belocean, allegedly entered into a charter party with the Ministry through Ward to ship another portion of the wheat that World Bulkers was to have transported. World Trade Shipping Corporation ("World Trade") of Oyster Bay, New York, was the ship broker through which Ward arranged the transaction with Belstove. World Trade had also served as broker for World Bulkers. Arne Fronsdal (also spelled Froensdahl in some of the papers filed in this case), a broker and president of World Trade, Fro.Tr. 21, represented World Trade in these transactions. F.H. Lorentzen & Sons ("Lorentzen") of Oslo, Norway, was the agent for Belstove with whom World Trade transacted business. Ward dealt directly with Lorentzen, bypassing World Trade, after May 23, 1987.

Thus, the lines of communication may be summarized by the following diagram, with the main lines of negotiation or agency relevant to this case indicated by double lines:

---

**2.** Petitioner has submitted the following documents: Petitioners' Submission, Petitioners' Reply ("P.Rep."), the transcript of the deposition of Karima McDaniel ("McD.Tr.") with exhibits 1 to 34 ("McD.Ex."), and exhibits A and B from the deposition of Arne Fronsdal.

Respondent has submitted the following documents: Respondent's Memorandum in Opposition to Petitioner's Request for Orders to Compel Arbitration; Respondent's Reply Memorandum in Opposition to Petitioner's Request for Orders to Compel Arbitration; transcripts of and exhibits from the depositions of Suleiman Belbeisi ("Bel.Tr.", "Bel.Ex."), Arne Fronsdal ("Fro.Tr.", "Fro.Ex.") (exhibits 1 to 20), Sal Gambino ("Gam.Tr.", "Gam.Ex."), and Bryan McNelis ("McN.Tr.", "McN.Ex."); exhibits A to Z from the McDaniel deposition ("McD.Ex."); and a separately numbered set of copies of deposition exhibits ("R.Ex.").

```
                          ┌──────────────────────────────┐
                          │  World Trade ═══ Lorentzen ══ Belstove
                     ┌════ │  (Fronsdal)
                     │     │            └──────────── World Bulkers
Ministry ═══ Ward ───┤  S.G.
(Muasher,   (Pressley,│ (Gambino)
Hawamdeh,   McDaniel) │
Belbeisi)             │
                     └════ Hudson ═══════════ Grieg ═══════ Herlofson
                          (McNelis)
```

---

As already noted, Ward is the weak link in this chain: the dispute centers on Ward's authority to act on behalf of the Ministry with regard to the Belstove and Herlofson charters.

*World Bulkers and Unicargo Charter Parties*

The events leading to this litigation began on March 21, 1987, when the Ministry, under Belbeisi's supervision, published an invitation to submit bids to supply United States wheat to Jordan and to transport the wheat to a Jordanian port, in connection with a USAID program. R.Ex. 4; *see* Bel.Tr. 35, 79–80. Under a non-exclusive shipping-agency agreement, R.Ex. 5, that had been entered into between the Ministry and Ward on February 22, Ward was to assist the Ministry of Supply in obtaining ships to transport the wheat.

Ward received various bids offering to enter into charter parties to transport the wheat. Following negotiations, the Ministry approved the final drafts of charter parties with Unicargo Shipping Co. S.A. ("Unicargo"), R.Ex. 6, and World Bulkers Inc., R.Ex. 7, and authorized Ward to execute the contracts sometime in April. Bel.Tr. 55, Bel.Ex. A–9. Unicargo performed under its charter party. Bel.Tr. 61.

In mid-May, however, it became apparent to Ward and the Ministry that World Bulk-

---

**3.** A "recap telex" recapitulates the terms of the fixture that have been agreed upon.

**4.** The times that telexes were sent, and the telex message numbers, are inferred from the transmittal records appearing on each telex. *See*

ers would not perform under its charter party. Bel.Tr. 61–62. The first shipment was to be loaded by May 25, McD.Tr. 22, and the supplier was pressing the Ministry to nominate a vessel by May 21. Bel.Tr. 119. The Ministry thus needed to find ships on short notice.

*Negotiations for Replacement Ships*

Ward proceeded to search on behalf of the Ministry for a replacement for World Bulkers. In a letter dated May 14, Belbeisi (of the Ministry) had instructed Pressley (of Ward) that the charter party should require, among other things, that the owner issue a 10 percent performance bond.

Ward conducted negotiations with Hudson by telex for the Herlofson charter. The negotiations culminated in a recap telex [3] sent by McNelis (of Hudson) to McDaniel (of Ward) on May 20 at 4:48 P.M.,[4] beginning as follows:

> HEREWITH RECAP OF FIXTURE AS PER AUTHORITY GIVEN BY BOTH PARTIES.
> *SUBJECT SHIPPERS/REC[ei]V[e]RS APPROVAL* BY LATEST 1200 HRS [New York time] 5/21/87....

McN.Ex. 1H & 8 (msg. no. BJM691) (emphasis added). The telex states various terms, including the following freight payment term:

> McD.Tr. 100. All times are United States Eastern Time unless otherwise noted. The local time in Jordan is 7 hours ahead, and the local time in Norway is 6 hours ahead, of the local time in the eastern United States.

FR[ei]GHT PAYM[e]NT:

*CLS 66 OF SUBJECT CP [charter party] DELETE PARA B* AND INSERT THE FOLLOWING: 95 PCT OF FRGHT TO BE PAID WITHIN 5 BANKING/WORKING DAYS UPON PRESENTATION OF [documentation]. THE 5 PERCENT BALANCE TO BE SETTLED TOGETHER WITH [demurrage or dispatch]....

*Id.* (emphasis added). The deleted Clause 66, Paragraph B, of the pro forma charter party had provided for a performance bond, which was one of the conditions set forth in Belbeisi's May 14 letter to Pressley. The telex concludes as follows:

OTHERWISE ALL TERMS AND CONDITIONS AS PER CH[a]RT[erer']S PORFORMA [*sic*] CP WITH LOGICAL ALTERATIONS AS APPLICABLE.... THANK YOU FOR YOUR COOPERATION IN CONCLUDING THIS FIXTURE.
GOOD LUCK WITH THE SUBJECTS. *Id.*[5]

On or prior to May 20, McNelis had come to doubt Ward's authority to act on the Ministry's behalf, because of "rumors in the market" that Ward was acting without authority. *See* McD.Tr. 23, 45, Gam.Tr. 11–12. McDaniel assured McNelis that she was acting on full authority, including the authority to fix a charter without approval from the Ministry. *See, e.g.,* McN.Tr. 128, 146–47, 181–82. McNelis believed this to be contrary to the usual practice, which requires the principal to approve all charters. *See* McN.Tr. 100–108, 138, Gam.Tr. 14.

It is somewhat more difficult to reconstruct the Belocean negotiations because a number of the relevant documents were destroyed in a fire at World Trade in October of 1988. Fro.Tr. 7, 85. Moreover, a substantial part of the negotiations took place over the telephone. Fro.Tr. 129. Fronsdal and McDaniel both testified at their depositions that a fixture was agreed upon that did not require the posting of a

performance bond. *See* Fro.Tr. 129, 132–33, McD.Tr. 29.

The hand-printed recap letter dated May 20, which Fronsdal faxed to McDaniel, indicates Fronsdal's position that a fixture had been concluded ("CONFIRM OUR TODAY'S FIXTURE AS follows"). McD.Ex. 20. The letter names the "M/S 'BEL OCEAN,'" and specifies a variety of terms. The letter makes no mention of a performance bond, but it contains a provision for freight payment that is substantially identical to the Herlofson charter, and which McDaniel contends was intended as an alternative to the performance bond: "95% FREIGHT PAYABLE INTO OWNERS' BANK PRIOR [to] RELEASE [of] B/LS [bills of lading], 5% ON SETTLEMENT [of] DEM[urrage]...." It concludes by stating that the fixture is "SUBJECT C/P [charter party] PROFORMA DETAILS WHICH OWNERS WILL REVIEW IN THE A M...." and asking Ward to "PLEASE FAX RECONFIRMATION." Fronsdal and McDaniel both testified that McDaniel accepted this fixture recap over the telephone on behalf of the Ministry, and that the fixture was not subject to the Ministry's approval. Fro.Tr. 132–33.

On May 20, at 2:45 A.M., during the course of negotiations, Pressley sent Belbeisi a telex, setting out the terms that had been negotiated. McD.Ex. 11 (msg. no. 1446). At 6:40 P.M. the same day, Pressley sent Minister Muasher a telex setting out the terms that had been agreed upon:

EXCELLENCY, ... WE ARE PLEASED TO INFORM YOU THAT *WE HAVE FINALIZED DETAILS* FOR VESSELS TO SHIP THE ... WHEAT.... 1ST SHIPMENT ON MV OCEAN BELL [*sic:* read "Belocean"].... HOWEVER SINCE VESSEL READY IN GULF, *OWNER UNWILLING TO POST PERFORMANCE BOND.* RATHER, OWNER WANTS 95% PAYMENT ON LOADING AND 5% RETAINED BY [the Ministry] TO SETTLE ALL ACCOUNTS.... *REGRET*

---

5. "Subjects" are conditions precedent to fixture. At this point, the parties were "fixed on subjects" (the fixture was "subject shippers/receiv-

ers approval") as opposed to "fixed clean" (that is, ready to sign a written charter party). *See* McD.Tr. 46.

*PERFORMANCE BOND PROBLEM* BUT BELIEVE UNDER CIRCUMSTANCES IMMEDIATE FIXTURE WITH WAITING VESSEL MOST CRITICAL. PLEASE HAVE [Belbeisi] ADVISE US ASAP IF ANY PROBLEM. OTHERWISE, WILL NOMINATE FIRST VESSEL TO BOTH SUPPLIERS FIRST THING THURSDAY OUR TIME.

McD.Ex. 12 (msg. no. 1449) (emphasis added). Six minutes later, Pressley sent Belbeisi a telex, which reads in relevant part: "PL[ea]SED, TO INFORM YOU THAT ALL VEESELS [*sic*] FIXED FIRM AS PER TLX [telex] ADDRESSED TO H.E. MINISTER OF SUPPLY." McD.Ex. 13 (msg. no. 1455).

*The Ministry's Response and Subsequent Developments*

However, the next day, Thursday, May 21, at 1:31 P.M. Amman time (6:31 A.M. Washington, D.C., time), Belbeisi telexed Pressley that the terms mentioned in the first telex of May 20 (msg. no. 1446) were unacceptable, because among other things,

WE [the Ministry] ALWAYS REQUIRED FROM [*sic*] THE OWNER TO ISSUE P/B [performance bond] UNCONDITIONAL TO OUR FAVOUR BEFORE WE OPEN THE L/C [letter of credit]....

McD.Ex. 15 (msg. no. 400:87). The telex also stated:

FINALLY DUE TO THE SHORTAGE IN TIME REGARDING MAY SHIPMENT AND [*sic*] WE THINK YOU ARE NOT IN THE POSITION TO BOOK ANY VESSEL AND YOU TRY WITHOUT SUCSESS [*sic*].... H.E. THE MIN[i]STER TELLING YOU TO PROCEED IMMEDIALETY [*sic*] TO AMMAN TO MEET WITH HIM AS SOON AS POSSIBLE. KINDLY CON-

FIRM WHEN YOU BE ABLE TO BE IN AMMAN.

*Id.* (emphasis added).

At 9:14 A.M. the same day, May 21, Pressley sent a telex to Belbeisi, stating that the Ministry's terms and conditions could be met, and that the vessels were already irrevocably fixed:

P/B [performance bond] IS NO PROBLEM. OWNERS ALWAYS TRY TO ASK FOR ALTERATIONS....

PL[ea]S[e], UNDERSTAND THAT THE BUSINESS IS FIXED ACCORDING TO THE TERMS AND CONDITIONS OF THE MINISTRY.... WE FIXED THOSE VESSEL[s] WITH YOUR AUTHORITY, AND WE CANNOT CANCEL ANYTHING AT THIS TIME. IF WE DO AND YOU PREFER TO FIX WITH OTHER OWNERS TH[e]N YOU ARE LIABLE FOR THE DEAD FREIGHT ALREADY FIXED....

McD.Ex. 16 (msg. no. 1457).

Later that same day, May 21, at 11:56 A.M. and again at 11:58 A.M., McDaniel telexed McNelis as follows: "WE ARE PLEASED TO INFORM YOU THAT WE ARE LIFTING THE SUBJECT ON HOLFSEN [*sic:* read "Herlofson"] OFFER EXCEPT FOR CLAUSE 66 PARA B." McN.Ex. 10 (msg. nos. 102, 103).

McNelis replied with a telex at 12:29 P.M. on May 21, expressing his understanding of McDaniel's telexes:

FOLLOWING SENT TO OWNERS [i.e., Herlofson, through Grieg] FOR CONFIRMATION

1) CHRTS LIF[t] SUB SHIPPERS/RECVRS APPROVAL [i.e., the charterers (the Ministry) "lift" (rescind) the "subject" (the condition) that the receivers [6] (the Ministry) must approve the charter party]

2) CL[au]S[e] 66 B TO REMAIN IN CP....

---

**6.** McDaniel testified that the use of the term "shippers/receivers" was an error, and that the term "receivers" alone should have been used. McD.Tr. 49. The testimony does not indicate whether the "receiver" was distinct from the "charterer" (i.e., the Ministry), but the Unicargo and World Bulkers charter parties appear to indicate that they are the same. R.Ex. 6 & 7, clause 4. In addition, a telex from Gambino to the Minister, dated June 26, indicates that the Herlofson fixture was subject to the Ministry's approval, Gam.Ex. 1, and McNelis also testified to that effect in his deposition. McN.Tr. 138.

McN.Ex. 11 (msg. no. BJM704). This was followed by another telex from McNelis to McDaniel at 12:41 P.M., stating in part:

OWNERS [i.e., Herlofson] H[e]REBY CONFIRM CHT RTS [*sic:* read "charterers'"], i.e., the Ministry by Ward] LAST TLX[.] HENCEFORTH WE ARE FULLY F[i]XED CLEAN. THANK YOU FOR YOUR COOPERATION.... THANK YOU FOR THIS FIXTURE

McN.Ex. 12 (msg. no. BJM706).

Ward never sent World Shipping reconfirmation of the Belocean fixture despite repeated requests from Fronsdal. *See* McD.Tr. 33–40. On Fronsdal's request, *see* Fro.Ex. 19, Lorentzen contacted Ward directly, Fro.Tr. 95, McD.Tr. 38, and was also unable to obtain written reconfirmation. *See* McD.Tr. 38–40. According to McDaniel's testimony, she had spoken to "the owners of the BELOCEAN" (presumably, Lorentzen acting for Belstove), who asked her "what it would take to get this thing going," and she responded that "the Minister wants a 10 percent performance bond." McD.Tr. 31. This is confirmed in a telex sent at 9:57 A.M. Oslo time on May 21, directly from Thor Bierge of Herlofson to the Ministry:

confirming pleasant telephone[ ]conversation w[i]th mrs mcdaniels [*sic* ] of ward marine, washington d.c[.] h[e]rewith confirm we will put up the necessary 10 pct performing [*sic* ] bond against 100 pct prepaid freight.

McD.Ex. 19.

On May 23 at 12:44 P.M. Amman time, Belbeisi telexed Pressley again, reiterating the Ministry's rejection of the fixtures:

THE CONTENTS OF OUR TLX NO 400/87 D[ate]D MAY 21/87 WAS [*sic* ] QUITE CLEAR THAT WE DID NOT ACCEPT THE TERMS AND CONDITIONS OF THE OFFER YOU SUBMMITTED [*sic* ] TO THE OWNER IN Y[ou]R TLXS NO 1446 [and] 1449 MAY 20/87.

HOWEVER IN[ ]SPITE OF THIS YOU AGREED WITH THE OWNER ON THE TERMS AND CONDITIONS AND WENT A HEAD [*sic* ] AND FIXED THE VESSEL WITHOUT HAVING OUR WRIT[t]EN APPROVAL AND WE RECONFIRM [reconfirmed?] TO YOU OUR NONACCEPTANCE BY TELEPHONE. IN VIEW OF THE ABOVE IT'S Y[ou]R OBLIGATION TO CANCEL THE VESSEL[s] YOU CLAIM TO HAVE FIXED[,] AND ANY DAMAGES WHICH MAY BE CAUSED BY YOUR FAILURE TO DO SO ARE YOUR OWN RESPONSIBILITY....

R.Ex. 20 (msg. no. 403/87). The Ministry—it is not clear when—had made alternative arrangements to ship the grain, and never used the Belocean or the Herlofson vessel. Bel.Tr. 67–68; *see* McD.Ex. 14.

The petitioners demanded that the Ministry submit to arbitration under the charter parties. When the Ministry refused, they brought the instant petitions.

## PROCEDURAL POSTURE

Because of the maritime subject matter of the dispute, the court has jurisdiction over these petitions under 9 U.S.C. § 4 and 28 U.S.C. § 1333. The *Belstove* case, No. 88 Civ. 9272, was initially assigned to Judge Sprizzo. The *Herlofson* case, No. 88 Civ. 7542, was initially assigned to this court.

After oral argument on September 15, 1989, Judge Sprizzo found that the existence of an arbitration agreement was at issue in the *Belstove* case, and ordered an evidentiary hearing as provided in 9 U.S.C. § 4. *Belstove Mgmt. v. Ministry of Supply*, No. 88 Civ. 9272 (JES) (S.D.N.Y. Sept. 15, 1989) (Sprizzo, J.) (order). This court made a similar ruling in an opinion in the *Herlofson* case on September 19, 1989. *Herlofson Mgmt. v. Ministry of Supply*, No. 88 Civ. 7542 (RLC), slip op. at 10, 1989 WL 111083 (S.D.N.Y. Sept. 19, 1989) (Carter, J.).

At the request of the parties, the actions were consolidated. *Herlofson Mgmt. v. Ministry of Supply*, No. 88 Civ. 7542 (RLC) (S.D.N.Y. May 14, 1990) (Carter, J.) (stipulation and order). The consolidated actions were then assigned to this court. Subsequently, the parties requested permission to submit transcripts of deposition testimony to the court in lieu of an eviden-

tiary hearing. *See* Rule 43(e), F.R.Civ.P. The court granted the request, and the parties have now made their submissions. *See supra* note 2.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *Power to Compel Arbitration*

The power of this court to compel arbitration comes from 9 U.S.C. § 4, which provides, in pertinent part, that any

> party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement....

The issue, then, in deciding each of these petitions, is whether there exists a "written agreement for arbitration."

■ It is not necessary, however, that the written agreement be signed by the respondent, but the question of who is bound by the arbitration agreement must be determined by ordinary principles of contract and agency. *A/S Custodia v. Lessin Int'l, Inc.,* 503 F.2d 318, 320 (2d Cir.1974). Drafts of a contract, reflecting an agreement to arbitrate, can provide the requisite writing. *Marion Coal Co. v. Marc Rich & Co. Int'l, Ltd.,* 539 F.Supp. 903, 907 (S.D.N.Y.1982) (Sand, J.). A fixture "subject to details" can also constitute an enforceable arbitration agreement. *Great Circle Lines, Ltd. v. Matheson & Co.,* 681 F.2d 121, 125–26 (2d Cir.1982). Assuming that Ward in fact entered into the agreements, the Ministry's duty to arbitrate essentially turns on whether Ward had actual or apparent authority to enter into the agreements on the Ministry's behalf.[7]

### *Actual Authority*

■ Authority to act as an agent "can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Restatement (Second) of Agency* § 26 (rev. ed. 1957) [hereinafter *Restatement* ]; *see Skyline Agency, Inc. v. Ambrose Coppotelli, Inc.,* 117 A.D.2d 135, 502 N.Y.S.2d 479, 489 (1986).

It is clear that Ward's shipping-agency agreement with the Ministry does not authorize it to fix vessels without the Ministry's approval. R.Ex. 5. That agreement is explicitly nonexclusive, *id.* art. 1, and provides, among other things, that

> The Agent [Ward] will *prepare for the Ministry* commodity contracts and freight charter parties and/or booking contracts designed for any commodity which may be purchased by the Ministry.

*Id.* art. 2(a) (emphasis added). The court sees nothing in the agency agreement that could reasonably be interpreted as authorizing Ward to sign a contract on the Ministry's behalf without specific authorization from the Ministry. Indeed, the parties acted on the interpretation that the Ministry's approval was required, inasmuch as Ward sought such approval for the Unicargo and World Bulkers charter parties. *See Restatement, supra,* § 42 ("If the authorization is ambiguous, the interpretation acted upon by the parties controls.").

---

7. Because this case is within the admiralty jurisdiction of this court, it is governed by federal maritime law. *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 227, 106 S.Ct. 2485, 2496, 91 L.Ed.2d 174 (1986). In certain circumstances, however, gaps in the maritime law may be filled by state law. *Igneri v. Cie. de Transports Oceaniques,* 323 F.2d 257, 259 n. 1 (2d Cir.1963), *cert. denied,* 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964). Moreover, despite the non-common-law origins of admiralty law, *see generally* G. Gilmore & C. Black, *The Law of Admiralty* §§ 1–1 to –4, –16 (2d ed. 1975), courts of admiralty may "look to the law prevailing on the land" for guidance in fashioning rules of decision "when there are no clear precedents in the law of the sea." *Igneri, supra,* 323 F.2d at 259; *see, e.g., Orient Mid–East Lines v. Albert E. Bowen, Inc.,* 458 F.2d 572, 575–76 (2d Cir.1972) (citing New York cases and the American Law Institute's *Restatement (Second) of Agency* ); *see also American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 284–85, 100 S.Ct. 1673, 1679–80, 64 L.Ed.2d 284 (1980). This inquiry is not tied to the law of a particular state, but depends on the general practice of common-law jurisdictions. *See Igneri, supra,* 323 F.2d at 260.

■ When it was clear that World Bulkers would default on its charter, Pressley sent a telex to Hawamdeh seeking express authority to fix another vessel or vessels to replace the World Bulkers ships. In the telex, sent on May 14, at 1:30 A.M., Pressley discussed the difficulties in obtaining a vessel, and went on to request authority to fix a contract:

ACCORDINGLY, UNLESS YOU SEE SOME OTHER MORE VIABLE OPTION, *WE SEEK YOUR AUTHORIZATION TO FIX A NEW CONTRACT* AT USD[ollars] 23.88 OR ANY BETTER RATE IF POSSIBLE IN THE INTERIM PRIOR TO 5 P.M. FRIDAY FOR MAY. IN THIS WAY, WE WILL BE ABLE TO TAKE IMMEDIATE ACTION TO TRY TO SALVAGE THE SITUATION AND LIMIT YOUR COSTS AS MUCH AS POSSIBLE.

McD.Ex. 7 (msg. no. 1432) (emphasis added).

Belbeisi replied to the telexes by faxing a handwritten letter to Pressley, dated May 14, stating in relevant part:

With reference to your telexes Nos 1428 and 1432 of May 13, 1987 Regarding May shipment.[8]

Pls. note that Mr. Hawamdeh and my self [*sic*] discussed the matter with H.E. Minister of Supply and he was extremely upset about the situations. The fact that you signed C/P [charter party] on our behalf with such a company [World Bulkers] without having any references on them. Also he is very upset that they did not issue a P/B [performance bond].

However we must try the best to avoid any further problem due to the shortage of time. Pls Note that it is known in Jordan that World Bulker [*sic*] have breached the C/P and have not preform [*sic*] May shipment. We are facing serious problem because of this.

In order to solve the problem H.E. Minister of Supply has decided to combine the May and June shipments totaling 50,000 MTs [metric tons] on one vessel on the following conditions:

(1) The Ocean Freight should be at the Rate of $18.25 per MT....

(2) Vessel's length overall not to exceed 200 Meters....

(3) Requested owner to issue 10% unconditional P/B in favour of Ministry of Supply....

Looking forward to hear[ing] from you very soon[;] if you need any further information or [have any] question[s,] my home phone [number is] [*deleted by court*], Amman.

McD.Ex. 8.

On its face, Belbeisi's letter appears merely to authorize Ward to propose vessels to the Ministry meeting the specified conditions. However, since it comes in response to Ward's telex seeking "authorization to fix a new contract," petitioners argue that it supports their position that Ward was authorized to fix a contract on the Ministry's behalf.

It is clear from the circumstances that Belbeisi did not intend to authorize Ward to conclude a contract without approval from the Ministry. The only circumstance that would suggest that Belbeisi's letter grants Ward authority to conclude a contract is the statement in Ward's telex seeking "authorization to fix a new contract." It is quite possible that Belbeisi misunderstood what Ward was asking for; in any case, he does not use Ward's language in his letter. With regard to the Unicargo and World Bulkers contracts, Ward had sent the charter parties to the Ministry for approval. If Belbeisi had wanted to change this practice, he would have done so in unmistakable language. Accordingly, the court finds that Belbeisi intended merely to au-

8. [Court's footnote.] Telex No. 1428, sent by Pressley to Hawamdeh on May 13, 1987, at 1:16 A.M., refers to the expected default of World Bulkers and states, in relevant part,

WE BELIEVE THE BEST LOWEST COST ALTERNATIVE, IF WORLD BULKERS FAIL[s] TO PERFORM IS TO SHIP ON VESSELS OF 50,000 CMT [*sic*]. WE ARE CURRENTLY,

NEGOTIATING TO FIX THE FIRST 2 CARGOES OF 25,000 MT ON ONE VESSEL OF 50,000 MT.

WE HAVE REQUESTED OFFERS FROM OWNERS IN OSLO, LONDON AND NEW YORK. WILL REVERT TOMORROW WITH RESULTS OF NEGOTIATIONS.

McD.Ex. 6.

thorize Ward to look for vessels to propose to the Ministry.

If an authorization is ambiguous, and the agent has reason to recognize the ambiguity, the agent may act only in accordance with the principal's intent, except in the case of an emergency. *See Restatement, supra,* § 44. The failure of Belbeisi's letter to grant Ward the requested authority unambiguously is completely evident and should have been readily apparent to Ward. Thus, Ward had a duty to obtain more definite instructions from the Ministry. *See id.* comment c. Despite the shortness of time, there was no "emergency" preventing Ward from doing so. Indeed, Belbeisi's letter invites further inquiries, and includes his home phone number to facilitate them. For these reasons, the court finds that Belbeisi's letter did not give Ward authority to fix a contract on the Ministry's behalf.

■ Other than Belbeisi's fax of May 14, petitioners point to a number of statements in McDaniel's testimony, indicating that McDaniel had full authority to fix a contract.[9] In particular, McDaniel testified as follows: "If I'm not mistaken Pressley had talked to the Minister and the Minister gave him the okay to go ahead and fix three cargoes of 50,000 metric tons each. The only thing the Minister wanted was the performance bond." McD.Tr. 28. She specifically testified that Pressley received by telephone the Minister's approval of the telex, McD.Ex. P (msg. no. 1449), informing him that they had fixed the cargoes. McD.Tr. 104. McDaniel testified that she was listening in on the telephone calls. McD.Tr. 16, 104–05. McDaniel also testified, with regard to her alleged general authority to fix a vessel without obtaining the Ministry's approval of the terms, that she had spoken with the Minister personally. McD.Tr. 14.

Belbeisi, however, testified in his deposition that the Minister is a political appointee—his title suggests that he is a cabinet officer—who has no knowledge of the shipping business and is not involved in the negotiation of contracts. Bel.Tr. 158. The court finds Belbeisi's testimony on this point to be credible, and believes that it is unlikely that the Minister would have approved the specific contract terms himself. It is even more unlikely that the Minister would have approved any contract terms without informing Belbeisi, who was ordinarily responsible for negotiating contracts of this type, *see id.,* or that he would approve the terms and then immediately instruct Belbeisi to act as if the terms had not been approved. McDaniel had misunderstood or misrepresented her authority on at least one other occasion: when the Ministry had rejected the Herlofson fixture, *see* McD.Ex. 15 (msg. no. 400:87); Bel.Tr. 88, she nonetheless communicated to Hudson that the Ministry had approved the fixture on condition that a performance bond be posted. *See* McN.Ex. 10 (msg. nos. 102, 103). The court also notes that it was in McDaniel's self-interest to testify that she was authorized to fix the contracts, given the possibility of liability for acting beyond the scope of her authority. *See Karavos Compania Naviera S.A. v. Atlantica Export Corp.,* 588 F.2d 1, 9 (2d Cir.1978). For these reasons, the court finds that McDaniel's deposition testimony regarding her authority is not credible.

McDaniel's other statements that she had full authority are conclusory and devoid of any detailed explanation as to the source of the putative authority. McD.Tr. 13–14, McD.Ex. 13 & 16. The court finds that petitioners have failed to meet their burden of establishing, by a preponderance of the evidence, that the Ministry granted Ward actual authority to conclude the fixtures.

*Apparent Authority*

Ward's lack of actual authority does not foreclose the possibility that its actions might bind the Ministry under the doctrine of apparent authority. Apparent authority to do an act "is created as to a third person by written or spoken words or any other

---

**9.** They also point to testimony by others indicating that McDaniel represented that she had authority to fix the charters. As evidence that McDaniel had actual authority, this is hearsay, and in any event, it adds little or nothing to the direct testimony of McDaniel.

conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Restatement, supra,* § 27, *quoted in part in Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir. 1989) (applying federal common law).

■ A party must establish two elements to recover on the theory of apparent authority: "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent." *Herbert Construction Co. v. Continental Ins. Co.,* 931 F.2d 989, 993–94 (2d Cir.1991) (citations and internal quotation marks omitted) (applying New York law); *see Hallock v. State,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984); *Ford v. Unity Hosp.,* 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973). The existence of the apparent authority must be "traceable" to the principal, and cannot be established by the unauthorized acts, representations or conduct of the agent. *Herbert Construction, supra,* 931 F.2d at 993; *Ford, supra,* 32 N.Y.2d at 473, 346 N.Y.S.2d at 244, 299 N.E.2d at 664; *accord Fennell, supra,* 865 F.2d at 502 (applying federal common law).

■ There is no evidence of direct communication from the Ministry to the petitioners or their agents that Ward or McDaniel had the authority to fix a contract without the Ministry's approval. If, however, an agent has *actual* authority to represent to a third party that she has authority to do a specific act, and in fact makes such representations, then the principal is "responsible" for the appearance of authority, and the agent has apparent as well as actual authority. *Restatement, supra,* § 27 comment c. Unless expressly directed not to do so, any agent is implicitly authorized to represent the extent of her authority. *Id.* § 27 comment c; *see also id.* §§ 35, 40, 46.

■ Conversely, unless expressly directed otherwise, an agent is not authorized falsely or incorrectly to represent the extent of her authority. As previously noted, McDaniel had no authority to fix vessels for the Ministry. To be sure, the uncontroverted testimony of McNelis and Fronsdal indicates that on May 19 and 20, respectively, McDaniel represented to them that she had that authority, McN.Tr. 128, Fro.Tr. 132–33, but there is no evidence that the Ministry authorized her to make this misrepresentation.

Petitioners rely on *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750 (9th Cir.1969), a non-maritime case, for the proposition that apparent authority may be created by "the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates." *Id.* at 756. In that case, the defendant's agent had customarily obtained authorization by telephone from the defendant during the negotiations that he conducted with the plaintiff. *Id.* n. 42. On that basis, the district court concluded that the plaintiff was entitled to believe that the agent was acting on the defendant's telephone instructions. *Id.* The Ninth Circuit upheld this finding of fact as not "clearly erroneous," but indicated that another trial judge might have resolved the matter differently. *Id.* at 756.

■ The existence of apparent authority is a question of fact. *Id.* at 755; *accord Herbert Construction, supra,* 931 F.2d at 994. Thus, under the rule of *Hawaiian Paradise Park,* apparent agency exists in this case only if, as a factual matter, the Ministry was responsible for granting permission to Ward to conduct business in a way that created a reputation of authority in Ward with respect to the petitioners or their agents. *See Hawaiian Paradise Park, supra,* 414 F.2d at 755–56; *see also Herbert Construction, supra,* 931 F.2d at 993.

■ The mere act of hiring Ward as its broker does not make the Ministry responsible for any belief by the petitioners' agents that Ward was authorized to fix contracts for the Ministry without its ap-

proval. Although it is customary in the shipping industry to do business through brokers, it is also customary for a broker to get the principal's approval before fixing a binding contract. *See* McN.Tr. 100–108, 138, Gam.Tr. 14. Thus, the hiring of Ward as a broker could not have created a reputation of authority to fix contracts without approval.

The Ninth Circuit's holding in *Hawaiian Paradise Park* also does not necessarily lead to the conclusion that McDaniel was acting with apparent authority in falsely communicating to McNelis, *see* McN.Ex. 10 (telexes of May 21, 1987, msg. nos. 102, 103), that the Ministry had approved the Herlofson charter, although it may leave open that possibility. *See id.* at 756 (district court finding of fact held not clearly erroneous). However, the holding of the Second Circuit in *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1 (2d Cir.1978), which unlike *Hawaiian Paradise Park* is binding on this court, makes clear that the Ministry cannot be held responsible on these facts for any belief by Herlofson or its agents that the Ministry had given such approval.

The *Karavos* case, like the present case, involved a petition to compel arbitration on an alleged fixture of a ship charter. The respondent in that case, Atlantica, had allowed an agent, Repetti, to use its telephone lines for the purpose of finding a vessel for Atlantica to charter. *Id.* at 6–7. The Second Circuit held that Atlantica's actions were insufficient, as a matter of law, to give Repetti apparent authority to fix a vessel. *Id.* at 10.

Petitioners attempt to distinguish *Karavos* by asserting that Repetti was not a broker but an alleged employee of Atlantica. P.Rep. 7. Repetti was, in fact, a representative of an independent trading company. *Karavos*, 588 F.2d at 3. Nonetheless, it is not important whether Repetti is called a "broker" or something else, since it is clear that Repetti's function was to secure vessels for Atlantica. *See id.* at 6. As petitioners point out, "not every employee of a trading company has authority to fix a

time charter," *id.* at 10, but it is also true that not every employee of a ship broker has authority to fix a voyage charter.

In addition, petitioners had a duty of reasonable inquiry to determine the scope of McDaniel's authority. *See id.* at 10. To be sure, *Herbert Construction, supra,* 931 F.2d at 995, holds that reasonable inquiry is not a prerequisite to maintaining a cause of action based on apparent authority under New York law; rather, "[i]n the apparent authority context, the duty to inquire only arises when the facts and circumstances are such as to put [the third party] on inquiry, the transaction is extraordinary, or the novelty of the transaction alerts the third party to the danger of fraud." *Id.* at 996, (internal quotation marks and citations omitted). However, the duty of inquiry in this case is governed by federal maritime law, as expounded in *Karavos*, rather than by New York state law, as expounded in *Herbert Construction. See supra* note 7. Moreover, the "novelty" of McDaniel's claim of authority to fix without consulting the Ministry, together with rumors in the market calling Ward's authority into doubt, put McNelis on actual notice of the danger of fraud. *See supra* page 7. Seeking and obtaining McDaniel's own assurances, without more, is insufficient to relieve McNelis of the duty of reasonable inquiry. *See Karavos, supra,* 588 F.2d at 9.

CONCLUSION

For the foregoing reasons, the court concludes that Ward had neither actual authority nor apparent authority to make a binding contract on behalf of the Ministry. It is therefore unnecessary to reach the other contentions of the parties.[10] The petitions are denied on the merits.

IT IS SO ORDERED.

**10.** According to the parties, World Bulkers has taken the position that World Shipping offered

the Belocean to the Ministry on behalf of World Bulkers under the original charter party between World Bulkers and the Ministry, and not under any separate charter party between Belstove and the Ministry. This contention has no bearing on the outcome of the present case. It is a subject for arbitration under the World Bulkers charter party, which is not now before the court.